PAUL W. MILLS

*v.*

MRS. C. A. (SHAND) MILLER

(No. 10291)

Submitted January 23, 1951.  Decided March 13, 1951.

*Okey P. Keadle,* for plaintiff in error.

*Duncan W. Daugherty, Duncan W. Daugherty, Jr.,* for defendant in error.

Fox, PRESIDENT:

This is an action of assumpsit, instituted in the Circuit Court of Cabell County, in which Paul W. Mills, plaintiff, seeks to recover from Mrs. C. A. (Shand) Miller, formerly Shand, the sum of $2,000.00 upon plaintiff's claim of compensation for the sale of a drug store known as Shand's Cut Rate Drug Store, Inc., located in the City of Huntington.

The declaration was filed at August Rules, 1946. It contains the common counts, and a second count in which it is alleged that in November, 1945, the defendant agreed that if he, the plaintiff, would furnish a purchaser for the Shand's Cut Rate Drug Store, she, the defendant, would pay to the plaintiff the sum of $2,000.00, for his services; that he had furnished such a purchaser; and that the defendant thereafter sold said drug store to him, and, therefore, became indebted to the plaintiff in the sum of $2,000.00, which she promised to pay, and which she had not paid. At the January term, 1947, the defendant appeared and filed her general issue plea, and special pleas Nos. 1 and 2. The plea of non assumpsit merely denied the allegations of the declaration. Special plea No. 1 alleged that the plaintiff had not qualified as a real estate broker in the State; and special plea No. 2 alleged that the Shand's Cut Rate Drugs was owned by Shand's Cut

Rate Drug Store, Inc., a corporation, under the laws of the State of West Virginia, and that any agreement in connection with the sale of said store, made by the defendant with the plaintiff was made by her as agent and officer of said corporation, and was not made on the responsibility of the defendant in her individual capacity. On these issues, the parties went to trial before a jury on September 28, 1949, the result of which was a verdict in favor of the plaintiff for the sum of $2,000.00. A motion to set aside said verdict was overruled, and judgment entered, on January 7, 1950, in favor of the plaintiff, to which, on motion of the defendant, we granted this writ of error on May 29, 1950.

In the trial of the case, the following facts were developed by the evidence: In October, 1945, the plaintiff, a drug salesman, called upon the defendant in her store in Huntington. He asked defendant whether the drug store was for sale, to which she replied in the negative, but a little later she told the plaintiff that she did want to sell. According to his testimony, he then told her that he generally got five per cent commission for selling stores. He then asked her: "Who will I collect my commission from?" She replied: "You will have to collect from the buyer." He then told her: "I will see what I can do." A short time later while he was calling on Lou R. Hager, owner of a drug store in Welch, West Virginia, and who was then trying to sell the same, he told Hager that he had Shand's Cut Rate Drug Store for sale. Later, in November, 1945, Hager, with one of his assistants, came to Huntington and discussed with the plaintiff several matters in connection with Shand's Cut Rate Drug Store. This meeting was held in the Governor Cabell Hotel in Huntington, and Hager was introduced by the plaintiff to the defendant at that time. The next day Hager, the defendant and the plaintiff spent considerable time looking over the drug store. The evidence is that at that time an agreement was made that Hager would be given an option to purchase this drug store. The date of such option is December 4, 1945, and, under its terms, would

expire forty-nine days thereafter. Under this option the price to be paid for the store was the actual cost of all merchandise plus $5,100.00 for all fixtures and equipment. About the time this option expired, Hager came to Huntington and made an effort to obtain a different contract than that contained in the option. He was unsuccessful in this attempt, and there was some question as to whether the option remained in force. Some dispute arose between Hager and the defendant, but this seems to have been later settled, and a few days later, about January 26, 1946, the sale of the drug store was consummated on a slightly different basis than that provided for in the option. In particular, it appears that under the option the furniture and fixtures in the store were to be sold at $5,100.00, and the stock of merchandise on a cost inventory basis. The agreement finally made, when the sale was consummated, was $50,000.00 as a lump sum for the merchandise, fixtures and equipment. The sale was consummated by Shand's Cut Rate Drug Store, Inc., as a corporation, and not the defendant.

The plaintiff did not appear to have much, if anything, to do with the negotiations, after introducing the parties in November, 1945, although it was quite apparent that he had not abandoned interest and knew when the transaction of sale was finally completed. Clearly, before the sale was consummated, he had learned that the purchaser would not pay a commission to him, and it appears that he must have learned this fact before Hager, the prospective purchaser, first came to Huntington, because the plaintiff testified: "That same Saturday I was up to see her to make arrangements for her to meet Mr. Hager, we were talking in her stock room. At that time I said to Mrs. Miller, 'Mrs. Miller, I have no way of collecting my commission from the buyer. What will it be worth to you for me to sell this store for you?' She said—Well, she got a pencil and figured—I don't know whether she had a pencil—'Fifty thousand dollars, five thousand, twenty-seven hundred and fifty dollars.' She said 'Paul, I don't feel I want to pay that much.' I said 'What is it

worth to you.' She said 'It is worth two thousand dollars.' And that is the figure we agreed on." Then after the sale to Hager was finally completed, and he was advised of that fact by Hager, he said to him: "Well, I said 'I have some unfinished business with Mrs. Miller.' And I used his phone in his store and called her up. Well, she kept talking and talking and talking, and I said 'Mrs. Miller, what are you trying to tell me?' She said 'Paul, I feel like I don't owe you anything.' I said 'Why?' 'Because Mr. Hager took so long in buying the store.' I said 'That being the case I will have to bring suit, as he threatened to do.' She said 'Before you do that you go see Mr. Keadle.' " Mrs. Miller does not deny that there was a conversation on the subject of commission, and she does not seriously disagree as to the time and place. Her statement is as follows: "After he told me that Mr. Hager wanted to have an appointment with me, he said 'Mrs. Shand, if Mr. Hager buys your store, what will be my commission?' And I said 'Commission? Why, what do you want, Paul?' And he said 'Five per cent.' So I roughly estimated what it would be. I said 'Why, Paul, that would be around two thousand dollars. That is an awful lot of money.' " She denies that she agreed to pay that sum or any other sum as commission. She also admits to the following conversation after the sale between her and the plaintiff: "He called me up on the phone and I was at my residence, and he said 'Mrs. Shand, don't we have some unfinished business?' And I said 'No, Paul, we do not.' And he said 'Why, you sold the store to Mr. Hager.' And I said 'Paul,' I said, 'That deal—the original deal with Mr. Hager entirely fell through.' And then he said 'You sold it to him.' Very excitedly saying that. And I said 'Paul, you see my attorney about this.' "

The testimony of Hager, the purchaser of the drug store, throws little light upon the matter at issue, but corroborates the testimony of the plaintiff, especially to the extent of showing that the plaintiff brought together the two parties to the sale, and that all parties to the transaction knew that the plaintiff expected a commis-

sion on completion of the sale. The fact that the sale was completed on a different basis than was first agreed upon by the parties is unimportant. If the plaintiff is entitled to recover in this case, it is entirely on the factual basis that he brought the parties together, and that on terms satisfactory to the owner and purchaser, the sale was made, and, as plaintiff contends, defendant specifically promised to pay him the sum of $2,000.00.

It is an admitted fact in the case that the drug store was owned by Shand's Cut Rate Drug Store, Inc., and the sale was consummated by and in the name of that corporation. One of the questions arising in this case was the question of whether compensation to the plaintiff for making the sale possible, if any was due, would be the obligation of the corporation rather than the defendant as an individual. The testimony does not indicate that the question of the store being owned by a corporation was referred to at any stage of the negotiation. The testimony of the plaintiff is, and is not denied by the defendant, that the fact of the existence of the corporation was not considered. Plaintiff's testimony is that when he discussed with the defendant what it would be worth to her to sell the store, she finally agreed that it would be worth $2,000.00, and he said she agreed to pay him that sum should the sale be made to Hager. The evidence shows that the defendant, at the time of this transaction, was the owner of four hundred and ninety-eight shares of the total issue of five hundred shares of stock in said corporation, and from this it is contended that she was, in reality, the true owner of the drug store offered for sale, and the one person who had any substantial interest therein.

Two instructions were given for the plaintiff, to which the defendant takes exception. First is Instruction No. 1 which reads:

"The Court instructs the Jury that if you believe from a preponderance of all the testimony in this case that the plaintiff had a verbal agreement with the defendant for the sale of the drug

store testified about and that the defendant agreed to pay the plaintiff the sum of $2,000 in the event he sold said store, and that this agreement was not rescinded, and that pursuant to this agreement the plaintiff brought the seller and buyer together and that as a result of this the sale was made, your verdict should be for the plaintiff."

This instruction was objected to and the particular ground was that it ignored the corporate form of the organization owning the business, and there was no evidence that the defendant was the true owner of the business. Previous to the offering of this instruction, there had been a motion to direct a verdict for the defendant on the grounds that the sale to Hager was made by the corporation with the knowledge of the plaintiff; that the defendant was not liable for any commission on any sale because it was a corporate obligation; also on the grounds that the plaintiff was not a licensed broker. The court also gave plaintiff's Instruction No. 4 which reads:

"The Court instructs the jury that if you believe from all the testimony in this case that the plaintiff entered into a contract for the sale of the drug store testified about with the defendant in her individual capacity, you may ignore the fact that said drug store was incorporated."

We see no error in the court's action in giving these two instructions. The fact that the defendant was the owner of all but two shares of the corporate stock, which would necessarily mean that she would obtain substantially all of the purchase price received from the sale thereof, the fact that she was the manager of the business, and at all times assumed to fully control the same, even to the extent of making an agreement for the sale thereof, affords grounds for an asumption that her interest was such as would reasonably justify her in agreeing to become liable for these commissions as an individual, because, in any event, she would become liable for practically all of these commissions had the obliga-

tion been one of the corporation. There would have been little difference in her situation. That is the only point raised by these instructions, and the position of the plaintiff being that the defendant personally agreed to pay these commissions was entitled to have that theory of the case presented to the jury.

The question raised on motion to direct a verdict for the defendant, that plaintiff was not a registered real estate broker, was correctly dealt with by the trial court. In the first place, there is no showing in the record that the plaintiff was regularly engaged in the business of a broker. It is true that on occasions he would negotiate sales of drug stores in connection with the business of a traveling drug salesman. We doubt whether a license is necessary in such a case, but even so, we do not think the lack of such a license should be permitted to be used by the defendant to avoid an obligation which a jury has found she entered into.

When we come to the dominent issue in the case, that is, whether there was an agreement on the part of the defendant to pay the plaintiff the sum of $2,000.00, we think the facts are sufficient to establish plaintiff's claim, and that the jury was warranted in returning a verdict in his favor. It is clear that the plaintiff brought the buyer and seller together, introduced them, and interested himself in showing the buyer the drug store he contemplated purchasing. The sale followed this introduction. At all times it was understood by the buyer and seller that plaintiff expected compensation for his services. Apparently there was never any contention that the buyer should pay these commissions. When the subject of the sale of the drug store was first brought up between the plaintiff and the defendant, the plaintiff was expressly told that commissions would have to be paid by the purchaser, and plaintiff, by his own admission, would be in no position to demand commissions from the defendant under the original understanding of defendant's willingness to sell the drug store. It is quite

clear that the plaintiff later discovered that the prospective purchaser would not pay commissions, and the subject was again brought up by the plaintiff with the defendant. He states unequivocally that she agreed to pay him $2,000.00, which would be substantially less than the five per cent which he originally considered he should receive. The defendant denies that she ever agreed to pay the plaintiff any sum as commission or otherwise. There is thus presented a direct conflict in the testimony of these two people. We think, however, that the circumstances of the case strongly indicate that there was an agreement between the plaintiff and defendant as to the payment of $2,000.00 as commissions.

According to the testimony, the defendant has not been entirely consistent in the positions she has taken with respect to the payment of the commissions claimed by the plaintiff. According to plaintiff's testimony, when he called her on the telephone after the sale had been consummated, she said to him: " 'Paul, I feel like I don't owe you anything.' I said 'Why?' 'Because Mr. Hager took so long in buying the store.' " The defendant gives her version of that conversation, and says, referring to the sale to Hager: "That deal—the original deal with Mr. Hager fell through." Either version of this conversation convinces us that there had been some understanding about the payment of commissions. According to plaintiff's version of that conversation, defendant denied liability because Hager took so long in buying the store; and, according to her version, the original deal, the one which was made when the parties were first brought together, fell through. Taking her version of that conversation, she did not deny that she had agreed to pay commissions. We think she did agree, and that the jury was correct in so finding. It is inconceivable that if she had not made such an agreement she would have failed to vigorously deny the same, instead of resorting to excuses for not carrying out what the plaintiff alleges was an agreement to pay him $2,000.00. A resort to these excuses comes close to an implied admission on

her part that she had at one time agreed to pay plaintiff this sum of money for the services of the plaintiff in bringing about the sale of her drug store.

One question still remains. Lou R. Hager was introduced as a witness for the plaintiff. During the course of his cross-examination he was asked: "Did you ever negotiate with Mills as agent for Mrs. Miller for the sale of this store?", to which he answered: "All I can say to that, Mr. Keadle, is that he is the one that told me that the store was for sale." He was then asked: "And that is all he did?", to which he replied: "Well, he told me he was going to get a percentage out of it." There was a motion to strike the last answer which the court overruled. We think the court clearly erred in refusing to strike this answer, but the question is raised whether it constituted prejudicial error such as would warrant reversal of the judgment complained of on that ground. We think it is generally understood among the profession that the admission of improper evidence is presumed to be prejudicial to the party against whom such evidence is supposed to operate. But, if there be such a rule, it has its exceptions. The early case of *Hall & Co.* v. *Lyons & Co.*, 29 W. Va. 410, 1 S. E. 582, holding that if a plaintiff's case had been made out so clearly that if the jury had found a verdict for the defendant, the court ought to have set it aside, as unsustained by the evidence, or contrary thereto, furnishes the foundation for the rule that admission of improper testimony is not reversible error, where, on the whole case, it appears that if such evidence had not been admitted the verdict of the jury could and should have been sustained on other testimony in the case. In the case of *Hubbard* v. *Equitable Life Assurance Society of the United States*, 88 W. Va. 361, 106 S. E. 786, we held:

> "Where improper or immaterial evidence is admitted and it clearly appears from the whole case, including the court's instructions to the jury, that it could not have produced a different

result, and had it been excluded the result would have been the same, it will be reversible error to set aside the verdict on that ground alone."

And in the case of *Byrd* v. *Virginian Railway Company*, 123 W. Va. 47, 13 S. E. 2d 273, we held:

"When improper evidence for the plaintiff is admitted over objection, and it does not affirmatively appear from the competent evidence in the record that a verdict for plaintiff could be sustained, the defendant will be presumed to have been prejudiced thereby."

This is another way of saying that where it does affirmatively appear from the competent evidence in the record that a verdict for plaintiff could have been sustained, without the evidence objected to, the case ought not to be reversed on that ground. See also 1 M. Jur. 719, on harmless error, and *Reilly* v. *Nicoll*, 72 W. Va. 189, 77 S. E. 897.

In this case, the witness volunteered the information that the plaintiff told him he was to get a percentage from the sale of Shand's Cut Rate Drug Store. At that time, plaintiff must have known that he had no agreement for a commission from the seller, and it clearly appears that he never did have such an agreement on the part of the buyer. The statement, therefore, was merely an expression of hope. He claims that he afterwards did obtain an agreement with the defendant that she would pay him a commission; and he may have expected that she would do so at the time he made this statement. In other words, the plaintiff did not state to Mr. Hager that he was going to get a percentage out of the sale from the defendant. The statement has little value as evidence, but it is hearsay and self-serving, and ought not to have been admitted. We do not think, however that it constitutes reversible error under the authorities mentioned above. Disregarding that statement, there is, in our opinion, ample evidence in the record to sustain the verdict of the jury, and the judgment of the court,

638

and, therefore, no need to rely in any degree whatever on the improper statement permitted to go into the evidence.

The judgment of the Circuit Court of Cabell County is affirmed.

*Affirmed.*