371 S.E.2d 619

**William REAGER, Sr., Father and Next Friend of William Reager, Jr., and William Reager, Sr., Individually**

v.

**Carl ANDERSON, M.D. and Joseph Melia, M.D.**

**No. 17123.**

Supreme Court of Appeals of West Virginia.

July 22, 1988.

---

Frederick P. Stamp, Frank X. Duff, Patrick S. Casey, Schrader, Stamp, Byrd, Byrum & Companion, Wheeling, for Dr. Melia.

John B. Garden, R. Noel Foreman, Wheeling, for Dr. Anderson.

Monty L. Preiser, Charleston, for William Reager, Sr.

McHUGH, Chief Justice:

This action is before this Court upon the appeal of Joseph Melia, M.D., the appellant

and one of two defendants below, from a final order of the Circuit Court of Ohio County, West Virginia ("the trial court") denying the appellant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Having reviewed the voluminous record, the petition for appeal and the excellent briefs and oral argument of counsel, we affirm the trial court's final order.

I

This case involves a minor whose left leg was amputated above the knee. According to the jury's verdict, the amputation was required because of the combined medical malpractice of the appellant, an orthopedic surgeon, and of Carl Anderson, M.D., a general surgeon. A chronology of the medical treatment provided in this case is presented here. Other facts will be stated in subsequent sections of this opinion in conjunction with the issues of law raised by those facts.

On Sunday, May 16, 1982, at about 2:30 p.m., William Reager, Jr. ("the patient"), at the time thirteen years of age, falls eighteen to twenty feet off a cliff and sustains injuries to his head and left leg. The patient arrives at Reynolds Memorial Hospital in Moundsville, West Virginia, at about 3:30 p.m., and is examined shortly thereafter in the hospital's emergency room by Dr. Carl Anderson, a general surgeon. X-rays are taken. At about 6:30 p.m., the nurses' notes indicate that the patient's toes on his left foot are cold, white and numb. The same symptoms are noted by the nurses at 8:15 p.m., at which time Dr. Anderson is called. After this call Dr. Anderson does not see the patient or do anything else for the patient. The nurses' notes throughout the remainder of the night of the 16th into the 17th indicate that the circulatory problems in the patient's left foot and leg come and go and that the patient constantly complains of severe pain in the left foot and leg.

On Monday, May 17, 1982, Dr. Anderson examines the patient's leg at about 9:15 a.m. He does not remove the ace bandage from the leg during the examination. At about 10:00 a.m. Dr. Anderson runs into the appellant, Dr. Melia, an orthopedic surgeon, at the elevator in the hospital. Both Dr. Anderson and the appellant agree that Dr. Anderson asked the appellant to look at the x-rays of the patient's leg. Dr. Anderson testified that he also at this time asked the appellant for a consultation; this is denied by the appellant. Within about five minutes thereafter, the appellant confirms what the radiologists had diagnosed from the x-rays, specifically, a nondisplaced, simple fracture of the tibia (the "shinbone") near the knee joint of the left leg of the patient. During the remainder of the 17th, the patient continues to have pain in his left leg; his leg becomes swollen; and his toes on his left foot are alternately cold and white, then pink and warm, with numbness in the toes and occasional burning sensation in the heel. The nurses' notes throughout this entire period of time indicate a pedal pulse, taken by placing two fingers on the bones at the top of the foot.

On Tuesday, May 18, 1982, Dr. Anderson sees the patient at about 9:45 a.m., but administers no treatment. At about 10:30 a.m., Dr. Anderson has a nurse call the appellant's office for a consult and writes "consult Dr. Melia [the appellant]." The appellant calls the hospital at about 12 noon and talks to a nurse and the patient's father. The appellant does not inquire of Dr. Anderson, of the nurse or of the patient's father about the patient's condition but tells the patient's father that he will visit the patient the next morning. Neither Dr. Anderson nor the appellant examine the patient until the next morning. During the remainder of the 18th, pain in the patient's left leg and impeded circulation signs continue.

On Wednesday, May 19, 1982, the appellant at about noon examines the patient, unwraps the ace bandage and notices compartmental syndrome, which is increased pressure and swelling and decreased circulation of blood and oxygen to the muscles in an enclosed area. Without looking at the patient's chart the appellant immediately thereafter performs a fasciotomy, an excision into the leg to release the pressure

and built-up fluids. He notices necrotic, or dead, muscles in the anterior part of the leg but viable muscles in the posterior part of the leg. He does not debride, or remove, the dead muscles. He does not call in a vascular surgeon; does not use a Doppler, a device used to "hear" a pedal pulse; and he does not order an arteriogram, in order to determine if there had been any damage to the popliteal artery, the main artery supplying blood to the lower leg, which is located behind the knee. Circulation after the fasciotomy improved somewhat, according to the appellant. A pedal pulse was present on several occasions during the evening of the 19th into the 20th.

On Thursday, May 20th, 1982, at about 4:00 to 4:30 p.m., three nurses note that there is no pedal pulse. Dr. Anderson and the appellant do nothing.

On May 22, 1982, the appellant uses a Doppler and confirms no pedal pulse.

On May 23, 1982, Dr. Anderson consults with Dr. Reed, a vascular surgeon.

On May 27, 1982, the patient is transferred to the Children's Hospital in Pittsburgh, Pennsylvania. Exploratory surgery indicates that muscles in all four compartments of the patient's left leg are dead.

On May 28, 1982, the patient's left leg is amputated above the knee. The pathological report indicates that a two-centimeter thrombosis (clot) was found in the popliteal artery at the level of the simple tibial fracture. There was also a very small bone fragment found there. The trauma to the leg had caused a clot in the popliteal artery. The reduced blood blow in the leg eventually resulted in the death of the muscles in the leg.

The patient's father subsequently brought this medical malpractice action for medical expenses and other special damages incurred by him and, on behalf of the patient, a minor, for his damages.

At trial in October, 1984, the appellant and his medical experts testified that the patient's left leg was lost due to a total occlusion (blockage) of the popliteal artery within "the golden period," that is, within approximately twelve hours, after the injury from the fall; that is, the left leg was lost by about 3:00 a.m. on May 17, 1982, which was before the appellant was even asked to look at the x-rays. The plaintiffs'/appellees' medical experts testified that the total occlusion of the popliteal artery did not occur until about twelve hours ("the golden period") after the pedal pulse stopped at about 4:30 p.m. on May 20, 1982; that is, the patient's left leg was lost by around 4:30 a.m. on May 21, 1982.

After all of the evidence was presented but before closing arguments, the plaintiffs/appellees entered into a settlement agreement with Dr. Anderson. Under that agreement Dr. Anderson was to pay $500,000.00 to the plaintiffs/appellees, subject to a reimbursement from the plaintiffs of any verdict amount in excess of $1,000,000.00, with a maximum reimbursement of $200,000.00 to Dr. Anderson. Dr. Anderson was to remain a party to the action, and the settlement agreement was not to be disclosed to the jury. This settlement agreement was promptly disclosed to counsel for the appellant and to the trial court. The trial court, over the appellant's objection, approved the settlement agreement, and the jury was not informed of the agreement.

The jury returned a verdict for the plaintiffs, awarding $22,938.33, the stipulated amount of special damages incurred by the patient's father, and $1,250,000.00 for the patient's damages. The jury found that Dr. Anderson was 45% at fault and the appellant was 55% at fault.

The trial court, with the plaintiffs' agreement, subtracted from the $1,250,000.00 award, a $75,000.00 payment previously made by Reynolds Memorial Hospital to the plaintiffs. The trial court ordered that the appellant was liable for 55% of the $1,175,000.00 balance, plus 55% of the father's damages of $22,938.33, for a total liability of $658,866.08.

The appellant thereafter timely moved for judgment notwithstanding the verdict or, in the alternative, for a new trial, assigning, *inter alia*, the same grounds as raised in this appeal. The trial court denied such motions.

In this appeal the appellant sets forth and briefs six assignments of error, as well as one point relating to the division of the costs of reproducing the appellate record. We will now discuss each of these matters.

## II

■ The appellant assigns as error the trial court's denial of his motions for directed verdict, made at the conclusion of the plaintiffs'/appellees' case and at the conclusion of all of the evidence, and the trial court's denial of his motion for judgment notwithstanding the verdict, on the question of liability. The appellant contends that such motions should have been granted due to the insufficiency of the evidence as to the appellant's liability. We disagree.

The Court, in syllabus point 5 of *Hatten v. Mason Realty Co.*, 148 W.Va. 380, 135 S.E.2d 236 (1964), held: "Questions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable [minds] may draw different conclusions from them." *Accord,* syl. pt. 4, *Grillis v. Monongahela Power Co.*, 176 W.Va. 662, 346 S.E.2d 812 (1986); syl. pt. 1, *White v. Lock*, 175 W.Va. 227, 332 S.E.2d 240 (1985); syl. pt. 6, *McAllister v. Weirton Hospital Co.*, 173 W.Va. 75, 312 S.E.2d 738 (1983); syl. pt. 1, *Ratlief v. Yokum*, 167 W.Va. 779, 280 S.E.2d 584 (1981).

In the present case reasonable minds could differ on the often conflicting testimony of the medical experts as to whether the appellant was negligent and whether any such negligence, together with any concurrent negligence of Dr. Anderson, proximately caused the plaintiffs' damages. Viewing the testimony, as we must, in light of the evidence most favorable to the plaintiffs/appellees as the prevailing party at trial, *see* syl. pt. 6, *McClung v. Marion County Commission*, 178 W.Va. 444, 360 S.E.2d 221 (1987), this Court concludes that the trial court properly denied the appellant's motions for a directed verdict and for judgment notwithstanding the verdict, on

the question of liability. The record indicates, *inter alia,* that the appellant was negligent in at least the following ways and that such negligence proximately contributed to the plaintiffs' damages: (1) By failing to see the patient on May 18, 1982, the day ·on which the appellant, according to his testimony, received an official consultation from Dr. Anderson; (2) By failing to diagnose an injury to the popliteal artery; and (3) By failing to perform debridement (removal) of the dead tissues in the patient's left leg when the appellant performed the fasciotomy on May 19, 1982.

With respect to (2) in the preceding paragraph, the record indicates that the appellant should have ordered studies of the popliteal artery no later than when he did the fasciotomy. Such studies would have revealed the injury to the popliteal artery. Thereafter the appellant should have surgically bypassed the blocked artery. Such surgery, as late as on May 19, 1982, would have saved the leg, with perhaps as much as 40% to 50% loss of function, including a "dropped" foot needing a brace or corrective ankle surgery. Restoration of circulation to the leg on May 18, 1982, would have resulted in perhaps as much as 20% to 30% loss of function of the leg, but amputation would have been avoided.

The fasciotomy showed some viable muscles; there was improvement of circulation thereafter for a period of time; and a pedal pulse was present after the fasciotomy. Therefore, the jury was warranted in disbelieving the appellant's argument that total occlusion of the popliteal artery, the main artery supplying blood to the leg, had occurred two days prior to the fasciotomy. The appellant's own expert admitted that all of the compartments of the leg should have been necrotic (dead) by the time of the fasciotomy on the 19th, if total occlusion had occurred at 3:00 a.m. on the 17th.

■ Based upon the medical testimony, this case comes within the principle set forth in syllabus point 5 of *Thornton v. CAMC*, 172 W.Va. 360, 305 S.E.2d 316 (1983):

Where a plaintiff in a malpractice case has demonstrated that a defendant's acts

or omissions have increased the risk of harm to the plaintiff and that such increased risk of harm was a substantial factor in bringing about the ultimate injury to the plaintiff, then the defendant is liable for such ultimate injury.

## III

█ The appellant assigns as error the trial court's denial of his motion for judgment notwithstanding the verdict or, in the alternative, for a new trial on the ground that the jury's apportionment of liability between the appellant and the codefendant, Dr. Anderson, was not supported by the evidence. We disagree.

█ In adopting our comparative negligence or causation rule,[1] this Court in *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 342, 256 S.E.2d 879, 885 (1979), stated: "[I]t will be the *jury's* obligation to assign the proportion or degree of this total negligence among the various parties, beginning with the plaintiff." (emphasis added) In a comparative negligence or causation action the issue of apportionment of negligence or causation is one for the jury or other trier of the facts, and only in the clearest of cases where the facts are undisputed and reasonable minds can draw but one inference from them should such issue be determined as a matter of law. The fact finder's apportionment of negligence or causation may be set aside only if it is grossly disproportionate. *Transamerica Insurance Co. v. Pueblo Gas & Fuel Co.,* 33 Colo.App. 92, 96–97, 519 P.2d 1201, 1204

(1973); *Stewart v. Wulf,* 85 Wis.2d 461, 471, 271 N.W.2d 79, 84 (1978).[2]

In the present case reasonable minds could differ as to the apportionment of negligence between the appellant and the codefendant, Dr. Anderson. The jury's apportionment, 55% to the appellant and 45% to Dr. Anderson, was not grossly disproportionate. The jury could, *inter alia,* have reasonably held the appellant as a specialist, an orthopedic surgeon, to a higher degree of responsibility than Dr. Anderson, a general surgeon, because a vascular problem resulting from an orthopedic injury was involved in this case. *See Hundley v. Martinez,* 151 W.Va. 977, 994–95, 158 S.E.2d 159, 169 (1967). In any event, the appellant's and Dr. Anderson's respective shares of causation of the plaintiffs'/appellees' damages were not so clear as to be matters of law for the court.

## IV

█ The appellant assigns as error the trial court's denial of his motion for a new trial on the ground that the damages in the amount of $1,250,000.00 awarded by the jury to the minor patient were clearly excessive. We disagree.

The gravamen of the appellant's argument on this point is that the plaintiffs'/appellees' evidence on the minor patient's special damages was speculative and could not, therefore, properly be considered an element of damages. The evidence on special damages relates to the projected cost of the novel prosthetic device discussed in

1. Use of the term "comparative causation" is more accurate than "comparative negligence" or even "comparative fault" in that the concept is applicable not only to negligence actions but also, under certain circumstances, to actions involving strict liability. *See* syl. pt. 5, *Star Furniture Co. v. Pulaski Furniture Co.,* 171 W.Va. 79, 297 S.E.2d 854 (1982). In actions involving strict liability the defendant's conduct or "fault," in the traditional sense of culpability, is not at issue. *Id.* 171 W.Va. at 86–87, 297 S.E.2d at 861; *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 427 (Tex.1984).

2. *See also State v. Kaatz,* 572 P.2d 775, 784–85 (Alaska 1977); *Johnson v. Cross,* 281 Ark. 146, 148, 661 S.W.2d 386, 387 (1983); *St. Pierre v. Public Gas Co.,* 423 So.2d 949, 951 (Fla.Dist.Ct.

App.1982); *Lyman v. Bourque,* 374 A.2d 588, 590 (Me.1977); *Sandhofer v. Abbott–Northwestern Hospital,* 283 N.W.2d 362, 368 (Minn.1979); *Speedway Transportation, Inc. v. DeTurk,* 183 Neb. 629, 632, 163 N.W.2d 283, 285 (1968); *Bellacome v. Bailey,* 121 N.H. 23, 27, 426 A.2d 451, 453 (1981); *Marcus v. Cortese,* 98 N.M. 414, 416, 649 P.2d 482, 484 (Ct.App.1982); *Weber v. City of New York,* 101 A.D.2d 757, 757, 475 N.Y.S.2d 401, 402, *aff'd mem. as unreviewable,* 63 N.Y.2d 886, 472 N.E.2d 1028, 483 N.Y.S.2d 200 (1984); *Lamkin v. Lynch,* 600 P.2d 530, 531 (Utah 1979); *Shea v. Peter Glenn Shops, Inc.,* 132 Vt. 317, 319, 318 A.2d 177, 178 (1974); *Haynes v. Moore,* 14 Wash.App. 668, 673–74, 545 P.2d 28, 32 (1975); *Connett v. Fremont County School District No. 6,* 581 P.2d 1097, 1100 (Wyo.1978).

the next section of this opinion and to the projected loss of future earnings.

The undisputed testimony of the plaintiffs'/appellees' economic expert witness indicates that the cost of the prosthesis and the annual maintenance costs therefor, reduced to present value, is $260,201.00. The prosthesis in this case will use many of the same components as a conventional artificial leg, and the costs were estimated by using manufacturer's costs/wholesale/retail figures used customarily in the industry.

With respect to loss of future earnings, the undisputed testimony of the plaintiffs'/appellees' economic expert and vocational rehabilitation expert indicates that the loss of future earnings would range from $192,236.00 to $1,154,942.00; within that range are figures of $301,043.00, $502,547.00 and $918,426.00, depending upon the vocational scenario which the jury believed would best apply to the patient. The five vocational scenarios given to the jury, one of which must apply, were:

(1) The patient chooses not to attend college but can hold a job; or

(2) The patient chooses to attend college, graduates and can hold a job; or

(3) The patient begins college, cannot finish due to medical reasons but can hold a nonskilled job; or

(4) The patient attends college and graduates but cannot hold a job thereafter due to medical problems; or

(5) The patient chooses not to attend college and for medical reasons cannot hold a job.

For each scenario, jobs were listed for a person with both legs and without one leg, and an average income was computed each way. The differences between average annual income with both legs and average annual income without one leg were multiplied by the expected number of work-force years and were reduced to present value.

No special interrogatory was submitted to the jury as to the vocational scenario which they selected.

It is significant that none of the testimony as to these elements of damages was disputed by any witness, even though the appellant conducted extensive pretrial discovery on these matters.[3] The weight of the evidence on these special damages was for the jury to decide.

Even if these special damages are not considered, the record in this case supports a jury verdict for permanent pain and suffering alone in the amount of $1,250,000.00. In *Williams v. Aer Lingus Irish Airlines*, 655 F.Supp. 425 (S.D.N.Y.1987), in comparison, the court refused to set aside, as clearly excessive, a jury verdict including an award of $1,200,000.00 for pain and suffering to a nine-year-old child whose foot was crushed. The jury also awarded $50,000.00 for medical expenses.

Comparing verdicts in other personal injury or wrongful death cases, from our own jurisdiction or others, is usually not very profitable. No two persons are alike. No two injuries are alike. No two juries are alike. *Wry v. Dial*, 18 Ariz.App. 503, 514–15, 503 P.2d 979, 990–91 (1972), *review denied* (Ariz.1973). The character of the injuries sustained, and their resultant effect upon the injured party, are never identical, and but seldom similar. *Williams Paving Co. v. Kreidl*, 200 Va. 196, 204, 104 S.E.2d 758, 764 (1958). "No one case can serve as an exact guide or rule for other cases." *Dumphy v. Norfolk & W. Ry.*, 82 W.Va. 123, 133, 95 S.E. 863, 867 (1918). A few comparisons, however, may be made here as illustrative of the relative size of the verdict in this case.

A gross award of $1,250,000.00 to a man in his mid-thirties who lost the lower part of his left leg was held not to be "shocking" in *Kelly v. Illinois Cent. G. R.R.*, 552 F.Supp. 399 (W.D.Mo.1982). In *Hollis v. Scott*, 516 So.2d 576 (Ala.1987), the court refused to set aside a $1,000,000.00 verdict as clearly excessive. The award was to a

---

**3.** Also see sections V and VIII of this opinion as to the significance of pretrial discovery in this appeal.

man of unspecified age whose left foot was amputated and whose right leg was substantially injured. The award included medical bills of $43,603.50. There being no claim or evidence of lost future income, the balance of the verdict was apparently for pain and suffering. *Parson v. City of Chicago*, 117 Ill.App.3d 383, 72 Ill.Dec. 895, 453 N.E.2d 770 (1983), involved an amputation of a seventeen-year-old girl's leg. A verdict for $1,250,000.00, consisting primarily of an amount for pain and suffering and, perhaps, an unspecified amount for lost future earnings, was upheld as not being clearly excessive. A $2,000,000.00 award was upheld in *Warmsley v. City of New York*, 89 A.D.2d 982, 454 N.Y.S.2d 144 (1982). The plaintiff in that case, a forty-three-year-old housewife, sustained, *inter alia*, a fracture of the tibia and fibula of her right leg, with subsequent infection and eventual amputation. The court emphasized that the plaintiff would have to endure a lifetime of pain and suffering. *See generally* annotation, *Excessiveness or Adequacy of Damages Awarded for Injuries to Legs and Feet*, 13 A.L.R. 4th 212 (1982 and Supp.1987), especially § 19 on the loss of one leg.

This Court, in syllabus point 1 of *Addair v. Majestic Petroleum Co.*, 160 W.Va. 105, 232 S.E.2d 821 (1977), held that "[c]ourts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption." *Accord*, syl. pt. 4, *Muzelak v. King Chevrolet, Inc.*, 179 W.Va. 340, 368 S.E.2d 710 (1988); *McClung v. Marion County Commission*, 178 W.Va. 444, 455 n. 13, 360 S.E.2d 221, 232 n. 13 (1987) (and cases cited there). Under this test we, like the trial court, do not believe the damages awarded in this case are clearly excessive. The record supports the verdict, and the authorities in the immediately preceding paragraph indicate that the verdict here is not "outrageous."

Finally, it would not be appropriate to order a remittitur, *see* syl. pt. 6, *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986), because the verdict in this case is not clearly excessive.

V

■ The appellant assigns as error the trial court's denial of his motion for a new trial on the ground that certain expert testimony, relating to a novel prosthetic device, was, over the appellant's timely protest, improperly admitted into evidence. Assuming, without deciding, that there was such error, this Court believes the same was harmless, nonreversible error in this case.

At trial the plaintiffs/appellees presented the testimony of Dr. Gordon D. Moskowitz, a mechanical engineer specializing in bio-mechanics, and the testimony of Edward Bromley, a prosthetist. Both witnesses testified on behalf of the plaintiffs/appellees regarding the prosthetic prospects for the minor patient. These two witnesses testified as to the recent invention of Dr. Moskowitz called the "Drexel–Moss" prosthesis, a myo-electrically controlled artificial leg, which perceives the electrical voltages that appear on the surfaces of the skin during contractions of the muscles. When the muscle contractions occur, they are processed through a computer and translated into movement of the prosthesis.

Dr. Moskowitz, who described himself as the "pioneer" or "principal developer" of this prosthesis, described the prosthesis as a "first prototype," which is being used only in his laboratory and has been tested for three or four years upon only one amputee. Dr. Moskowitz testified that he intended to have this leg prosthesis on the market by 1990, based, *inter alia*, upon the lead time for a similar myo-electrically controlled artificial above-elbow prosthesis called a "Utah" arm. Dr. Moskowitz also testified as to the reasonably expected selling price of the Drexel–Moss leg prosthesis.

On cross-examination Dr. Moskowitz admitted that the Drexel–Moss leg prosthesis was not currently being sold anywhere in the world. He also admitted that he could not, of course, anticipate all of the prob-

lems in completing the final version of this prosthesis and that there was a possibility that funding for this prosthesis could be terminated before it is marketed. Finally, Dr. Moskowitz admitted the final version of the Drexel–Moss leg prosthesis had not yet gained general acceptance in the field of prosthetics.

Based upon this last admission, the appellant, citing *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), argues here, as he did at trial and in post-trial motions, that the expert testimony relating to the Drexel–Moss leg prosthesis was inadmissible, as the underlying scientific principle is not "sufficiently established to have gained general acceptance in the particular [scien-

tific or technical] field in which it belongs." *Id.* at 1014.

We need not reach the *Frye* issue in the present case.[4] The harmless error rule, Rule 61 of the *West Virginia Rules of Civil Procedure*, applies to this assignment of error involving the admissibility of expert testimony on the novel prosthesis.[5] In syllabus point 2 of *Boggs v. Settle*, 150 W.Va. 330, 145 S.E.2d 446 (1965), the Court held: "On appeal of a case involving an action covered by the Rules of Civil Procedure, this Court will disregard and regard as harmless any error, defect or irregularity in the proceedings in the trial court which does not affect the substantial rights of the parties." *Accord*, syl. pt. 3, *Original Glorious Church of God in Christ,*

**4.** *Frye*'s "general acceptance" standard for the admissibility of scientific or technical evidence appears to have had little impact in civil cases. *United States v. Downing*, 753 F.2d 1224, 1235 n. 12 (3d Cir.1985).

The case now before us was tried prior to the effective date of the *West Virginia Rules of Evidence* (February 1, 1985). Nonetheless, Rule 702 of the *West Virginia Rules of Evidence* is generally consistent with the preexisting common law in civil cases in this jurisdiction. *Rozas v. Rozas*, 176 W.Va. 235, 239 n. 2, 342 S.E.2d 201, 206 n. 2 (1986). Rule 702 of the *West Virginia Rules of Evidence* provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Thus, Rule 702 of the *West Virginia Rules of Evidence* provides a more lenient standard for admissibility of expert testimony than *Frye*'s "general acceptance" test. "Nothing in Rule 702 requires that expert testimony be based [up]on scientific principles that are generally accepted in the scientific community." F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 7.1(B)2., at 421 (2d ed. 1986). *See also Barmeyer v. Montana Power Co.*, 202 Mont. 185, 193, 657 P.2d 594, 598 (1983) (so interpreting the identically worded *Mont.R.Evid.* 702), *overruled on another point, Martel v. Montana Power Co.*, 231 Mont. 96, 102, 752 P.2d 140, 145 (1988).

As this Court recently noted, there is a rapidly developing body of law interpreting Rule 702 of the *Federal Rules of Evidence*, which is identical to our Rule 702, as limiting the *Frye* "general acceptance" test to a test solely for determining whether *judicial notice* can be taken of the reliability of the scientific or technical evidence. *State v. Armstrong*, 179 W.Va. 435, n. 4, 369 S.E.2d 870, 874 n. 4 (1988) (and authorities cited

there). Therefore, according to this view, a scientific or technical expert's testimony is admissible if shown to involve relevant scientific or technical evidence which assists the trier of the facts to understand a relevant factual issue, even if such scientific or technical evidence and the underlying scientific or technical principle(s) are not yet generally accepted in the particular scientific or technical field. *Id.*

According to this view, in a civil case in which the reliability of the scientific or technical evidence cannot be judicially noticed, its reliability must be demonstrated at trial. According to this view, the pivotal question in a civil case in deciding admissibility is whether both sides have had a fair opportunity to test the reliability of the scientific or technical evidence. S. Saltzburg and K. Redden, *Federal Rules of Evidence Manual* 633 (4th ed. 1986). Pretrial discovery in a civil case is ordinarily instrumental in providing such opportunity. *See, e.g., Clinchfield R.R. v. Lynch*, 784 F.2d 545, 554 (4th Cir. 1986).

Having decided this assignment of error on another ground, we believe it is not necessary in this case to determine whether the admissibility issue is governed by *Frye*, Rule 702 of the *West Virginia Rules of Evidence* or both.

**5.** *W.Va.R.Civ.P.* 61 provides:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

*Inc. of Apostolic Faith v. Myers,* 179 W.Va. 255, 367 S.E.2d 30 (1988); syl., *Geary Land Co. v. Conley,* 175 W.Va. 809, 338 S.E.2d 410 (1985); syl. pt. 4, *McAllister v. Weirton Hospital Co.,* 173 W.Va. 75, 312 S.E.2d 738 (1983). In other words, "[t]he conduct of a civil trial does not have to be perfect in order to be affirmed on appeal. Rule 61, W.Va. R.C.P." Syl. pt. 18, *Ilosky v. Michelin Tire Corp.,* 172 W.Va. 435, 307 S.E.2d 603 (1983).

█ Here, any error as to the admission of the evidence on the novel prosthesis would have been harmless, for, as we discussed in section IV of this opinion, the jury's award was supported by the evidence on the permanent pain and suffering alone, without any evidence on special damages, such as the cost of a prosthesis. Thus, this case comes within the specific application of the harmless error rule set forth in syllabus point 2 of *Mills v. Miller,* 135 W.Va. 627, 64 S.E.2d 111 (1951):

> When improper or incompetent evidence for the plaintiff is erroneously permitted to go to a jury, but it affirmatively appears, from the competent evidence in the case that the verdict of the jury in favor of the plaintiff was fully warranted, the error aforesaid will be treated as harmless and nonprejudicial, and the verdict so returned, and the judgment based thereon, will not be disturbed by this Court. The same principle applies to a case where improper testimony favors a defendant, and the verdict is in his favor.

*See also Royal Furniture Co. v. City of Morgantown,* 164 W.Va. 400, 407–08, 263 S.E.2d 878, 883 (1980) (no reversible error where certain evidence adduced did not conform strictly to law of damages; admissible evidence on damages supported award in excess of verdict).

## VI

The appellant assigns as error the trial court's denial of his motion for a new trial on the ground that he was prejudiced by the trial court's refusal to disclose the settlement agreement in this case to the jury. Under the circumstances of this case, we disagree.

This case involves a so-called "Mary Carter" settlement agreement. The name is derived from *Booth v. Mary Carter Paint Co.,* 202 So.2d 8 (Fla.Dist.Ct.App.1967), *overruled in part, Ward v. Ochoa,* 284 So.2d 385 (Fla.1973). This Court summarized the four essential features of a "Mary Carter" settlement agreement in *State ex rel. Vapor Corp. v. Narick,* 173 W.Va. 770, 772, 320 S.E.2d 345, 347–48 (1984), each of which is present here: (1) The agreeing defendant(s) must remain in the action in the posture of defendant(s); (2) The agreement must be kept secret;[6] (3) The agreeing defendant(s) guarantee to the plaintiff a certain monetary recovery regardless of the outcome of the action; and (4) The agreeing defendant(s)' liability is decreased in direct proportion to the increase in the nonagreeing defendant(s)' liability.

In *Vapor* we observed that several courts and commentators consider "Mary Carter" agreements to be invalid as antithetical to a fair trial, while other courts have upheld such agreements where certain procedural safeguards have been employed.[7] Syllabus point 1 of *Vapor* sets forth one of these procedural safeguards: "[P]rompt disclosure is required to both the court and opposing counsel once such a ['Mary Carter'] settlement is made." Quoting syllabus point 1 of *Sanders v. Roselawn Memorial Gardens,* 152 W.Va. 91, 159 S.E.2d 784 (1968), this Court in syllabus point 2 of *Vapor* emphasized that the law favors settlements but also subjects them to judicial scrutiny:

> 'The law favors and encourages the resolution of controversies by contracts

---

**6.** Although the settlement agreement in this case was disclosed to the trial court and to counsel for the appellant, it was "secret" in the more significant sense of nondisclosure to the jury.

**7.** Upon analysis we found that the agreement in *Vapor* was not a "Mary Carter" agreement. Nor

was a "Mary Carter" agreement involved in *Grillis v. Monongahela Power Co.,* 176 W.Va. 662, 346 S.E.2d 812 (1986), where a nonsettling defendant sought disclosure to the jury of the fact that a settling co-defendant had been *dismissed* as a party.

of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy.'

*Accord,* syl. pt. 1, *F.S. & P. Coal Co. v. Inter–Mountain Coals, Inc.,* 179 W.Va. 190, 366 S.E.2d 638 (1988); syl. pt. 2, *Bd. of Ed. v. Starcher,* 176 W.Va. 388, 343 S.E.2d 673 (1986).

■ In determining the validity of "Mary Carter" settlement agreements, it is important to recognize that prompt disclosure of such agreements to the trial court and to opposing counsel is required because such agreements tend to realign the loyalties of the parties and change their trial tactics from what normally would be expected. It is critical to the fair conduct of the trial to disclose promptly the settlement terms to the court and to opposing counsel so that the court can decide whether the agreement is valid, and if so, what measures should be taken to ensure that the nonsettling party(ies) will not be prejudiced. *Vapor,* 173 W.Va. at 773, 320 S.E.2d at 348.

Finally, in note 10 of *Vapor* this Court gave an example of an available procedural safeguard in a case involving a "Mary Carter" settlement agreement: A nonsettling defendant may, in the sound discretion of the trial court, be permitted to cross-examine in order to show bias or prejudice of a witness as a result of the settlement, and "it is commonly held that the jury should be informed of the general nature of the compromise agreement so that they will know how the parties' loyalties may be affected by it. The underlying concern is to ensure a fair trial." (citations omitted)

■ We hold that disclosure to the jury of the general nature of a "Mary Carter" settlement agreement is not required in each case; such disclosure lies within the sound discretion of the trial court. Where the "Mary Carter" agree-

ment is not reached until after all or most of the evidence has been presented, and the settling defendant during closing argument and examination does not indicate to the jury a realignment of loyalties so as to prejudice the nonsettling defendant(s), it is within the sound discretion of the trial court to refuse to disclose the general nature of the "Mary Carter" agreement to the jury. *See, e.g., Reichenbach v. Smith,* 528 F.2d 1072, 1074–76 (5th Cir.1976); *Taylor v. DiRico,* 124 Ariz. 513, 515–16, 606 P.2d 3, 5–6 (1980); *Frey v. Snelgrove,* 269 N.W.2d 918, 922 (Minn.1978). Such are the circumstances here.

This concept is analogous to syllabus point 2 of *Grillis v. Monongahela Power Co.,* 176 W.Va. 662, 346 S.E.2d 812 (1986):

> In the absence of a particularized showing on the part of the remaining parties to a suit that one or more of them will suffer prejudice if the trial court fails to advise the jury of the dismissal of [or, here, settlement by] one or more parties to the suit, or that another party has taken an unfair advantage of the dismissal [or settlement] in its presentation and argument of the case, there is no duty on the trial court to so instruct the jury regarding the dismissal of a party from the suit [or regarding the bias or prejudice of a settling party].

*Grillis* clarified that syllabus point 2 of *Groves v. Compton,* 167 W.Va. 873, 280 S.E.2d 708 (1981), did not impose a mandatory duty upon the trial court to disclose a dismissal of a party to the jury.

The appellant argues that the trial court should have disclosed to the jury the "Mary Carter" agreement in the present case primarily because counsel for the plaintiffs/appellees during closing argument, for the first time at trial, emphasized repeatedly the fault of the appellant, as opposed to that of Dr. Anderson. The appellant has, however, failed to make a particularized showing of prejudice.[8]

**8.** The trial court expressed some concern that the tenor of the plaintiffs'/appellees' closing argument strengthened the appellant's motion for disclosure to the jury of the general nature of

the settlement with Dr. Anderson. The trial court decided, however, not to make such disclosure. We cannot say that the trial court abused its discretion.

## VII

The appellant assigns as error the trial court's calculation of his liability in light of the monetary settlement obtained by the plaintiffs/appellees from Dr. Anderson. We believe that the trial court arrived at the correct amount for the appellant's liability.[9]

This Court adopted comparative negligence in *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979). In *Bradley* we observed: "Our comparative negligence rule does not change the right of a joint tortfeasor to obtain a *pro tanto* credit on the plaintiff's judgment for monies obtained by the plaintiff in a settlement with another joint tortfeasor." *Id.* at 345, 256 S.E.2d at 886–87. *See also Groves v. Compton*, 167 W.Va. 873, 877, 280 S.E.2d 708, 711 (1981); *Messer v. Arlen Realty & Development Corp.*, No. 78–2079 (S.D.W.Va. May 19, 1981) (unpublished Memorandum Order) (Copenhaver, J.).

In construing *W.Va.Code*, 55–7–13 [1931],[10] this Court held in syllabus point 3 of *Sitzes v. Anchor Motor Freight, Inc.*, 169 W.Va. 698, 289 S.E.2d 679 (1982): "As between joint tortfeasors, a right of comparative contribution exists *inter se* based upon their relative degrees of primary fault or negligence." We held in syllabus point 4 of *Sitzes:* "Once comparative fault in regard to contribution is recognized, recovery can be had by one joint tortfeasor against another joint tortfeasor *inter se* regardless of their respective degree[s] of fault so long as the one has paid more than his *pro tanto* share to the plaintiff." The definition of *"pro tanto* share" was set forth in note 23 of *Sitzes:* "In a tort action where, as here, the jury is asked in a comparative contribution context to assign a percentage of fault, this percentage of fault becomes for contribution purposes the *pro tanto* share of the judgment." *Id.*, 169 W.Va. at 715 n. 23 (in part), 289 S.E.2d at 689 n. 23 (in part).

**9.** We note that there are three basic approaches to handling a partial settlement, that is, a settlement by less than all of the joint tortfeasors, in a multi-defendant tort case: (1) the *per capita* (sometimes called the *pro rata* ) verdict-reduction method, (2) the monetary (sometimes called the *pro tanto* ) verdict-reduction method and (3) the comparative causation (sometimes called the equitable) verdict-reduction method. Under the *per capita* method the verdict is reduced for a partial settlement by the ratio of the number of settling defendants to the number of total defendants. Under the monetary method the verdict is reduced for a partial settlement by the amount of the settlement (or by the amount or proportion designated in the settlement agreement, if such is greater than the consideration paid under the settlement). Under the comparative causation method the verdict is reduced for a partial settlement by the percentage of comparative negligence or causation attributable to the settling defendant(s). Under each of these methods of verdict reduction, the nonsettling defendant(s)' right to contribution from the settling defendant(s) is extinguished and replaced by the verdict reduction. *See Restatement (Second) of Torts* § 886A comment m (1977); *Unif. Comparative Fault Act* § 6 comment, 12 *U.L.A.* 47 (Supp.1987).

Each of these methods has its drawbacks in that each method fails to attain all three of the tort system's general goals of (1) promoting full, but not more than full, recovery by injured persons, (2) encouraging settlements and (3) achieving equitable sharing of liability between or among joint tortfeasors. *Miller v. Apart-*

*ments & Homes of New Jersey, Inc.*, 646 F.2d 101, 109 (3d Cir.1981). *See also* Harris, *Washington's Unique Approach to Partial Tort Settlements: the Modified Pro Tanto Credit and the Reasonableness Hearing Requirement*, 20 Gonz. L.Rev. 69 (1984–85); Lewin, *Comparative Negligence in West Virginia: Beyond* Bradley *to Pure Comparative Fault*, 89 W.Va.L.Rev. 1039, 1045–51 (1986–87); Stoneking, *Beyond* Bradley: *A Critique of Comparative Contribution in West Virginia and Proposals for Legislative Reform*, 89 W.Va.L.Rev. 167, 184–87 (1986–87); Emch, *Comparative Negligence in West Virginia: A Defense Overview*, 82 W.Va.L.Rev. 493, 515 (1979–80).

The appellant's argument is *not* directed toward which of the above verdict-reduction methods should be utilized. Instead, the appellant seeks to reduce the verdict by the settlement amounts of $75,000.00 and $500,000.00 and argues that he is liable for 55% of the balance. We need not discuss the above verdict-reduction methods in more detail and we need not decide which method is most desirable because the trial court arrived at the correct amount for the appellant's liability, although it utilized a different method than we do here.

**10.** *W.Va.Code*, 55–7–13 [1931] provides:

Where a judgment is rendered in an action ex delicto against several persons jointly, and satisfaction of such judgment is made by any one or more of such persons, the others shall be liable to contribution to the same extent as if the judgment were upon an action ex contractu.

Reading *Bradley*'s *pro tanto* credit rule and *Sitzes'* comparative contribution rule together, as well as *W.Va. Code*, 55–7–13 [1931], which provides for contribution after a joint judgment, this Court holds that in a case in which a settling defendant, pursuant to a "Mary Carter" settlement agreement, remains an active party and incurs a joint judgment, a verdict for the plaintiff will be reduced by the amount guaranteed in the settlement, and the defendants' right to comparative contribution will be preserved. We believe that a defendant who settles pursuant to a "Mary Carter" settlement agreement and remains in the case through the jury verdict should remain liable for contribution on the judgment. As the settling defendant has, by the nature of such an agreement, elected to remain a party, such party has permitted a joint judgment to be rendered against him and the other joint tortfeasor. By electing to remain in the case he becomes subject to the contribution after judgment statute, *W.Va. Code*, 55–7–13 [1931], and will be liable for contribution in favor of the other joint tortfeasor if his settlement share is less than his allocated share of causation as apportioned by the jury. In this case Dr. Anderson's allocated share of causation was found to be 45%.

Because the appellant requested a special interrogatory for the jury to apportion the liability between him and Dr. Anderson, the jury found the appellant to be 55% at fault and Dr. Anderson, who remained an active party under the "Mary Carter" settlement agreement, to be 45% at fault. Dr. Anderson would thus be liable for 45% of $1,197,938.33 ($1,250,000.00 plus $22,938.33 less $75,000.00 [11]), which is $539,072.25. He guaranteed only $500,000.00, which is $39,072.25 less than his comparative contribution share.

The appellant was found to be 55% at fault and would owe 55%, or $658,866.08. However, insofar as the plaintiffs/appellees are concerned, they have settled with Dr. Anderson and the plaintiffs/appellees are foreclosed from obtaining anything above the $500,000.00 from Dr. Anderson. The plaintiffs/appellees may recover the remaining balance due on the judgment from the appellant, as under *Bradley* joint and several liability is still recognized. The appellant then owes the plaintiffs/appellees the amount of their verdicts less the settlement figures, i.e., $1,250,000.00 plus $22,938.33 less $75,000.00 and $500,000.00, or $697,938.33. The appellant upon payment of this amount to the plaintiffs/appellees will have exceeded his 55% allocated share of causation, i.e., $658,866.08, by $39,072.25 and will be able to collect this amount from Dr. Anderson by way of contribution under *W.Va. Code*, 55–7–13 [1931].

It is interesting to note that Dr. Anderson's "Mary Carter" settlement for an amount less than his comparative contribution share enures to the benefit of the appellant to the extent of the appellant's right to contribution. In contrast, had Dr. Anderson been dismissed as a party under a regular, non-"Mary Carter" settlement, the appellant, without a right to contribution from Dr. Anderson, would have been liable for $697,938.33 ($1,250,000.00 plus $22,938.33 less $75,000.00 and less $500,000.00).

## VIII

The appellant finally argues that the appellees should be assessed the portion (58%) of the costs of reproducing the record in this appeal which represents allegedly unnecessary matters designated by the appellees. Under the particular circumstances of this appeal, we disagree with this argument of the appellant.

*W.Va.R.App.P.* 8(d) provides in pertinent part: "The designations [of the appellate record] should include only matter relevant to the issues presented by the appeal. When, in the opinion of the Supreme Court, unnecessary matter has been designated, it may withhold or divide costs as justice may require." This type of rule is designed not only to avoid unnecessary printing or copy-

---

**11.** In this appeal there is no challenge to the trial court's manner of handling the $75,000.00 payment by Reynolds Memorial Hospital, the negligence of which, if any, was not presented as a question for the jury to decide. We there-fore express no opinion as to the validity of the manner in which this payment was handled and will assume such validity for purposes of this opinion.

ing costs, but also to furnish the appellate court with a record which contains only those matters it needs to consider in disposing of the issues presented. *City of Roanoke v. Young*, 208 Va. 618, 620, 159 S.E.2d 661, 663 (1968).

In the present case the appellant designated certain matters to be included in the appellate record. The appellees thereafter designated the entire trial court file, excepting notices, summonses and the like. As noted by the appellant in his brief, the bulk of the materials considered by him to be unnecessary to the decision of this appeal is composed of pretrial discovery depositions and interrogatories.

In most civil cases pretrial discovery matters would likely be of limited, if any, relevance to issues raised on appeal. Here, however, pretrial discovery matters were relevant to the assignments of error relating to excessiveness of damages and admissibility of expert evidence. See sections IV and V of this opinion. Accordingly, where, as here, the matters designated for inclusion in the appellate record are relevant to the issues presented by the appeal or cross-assignment(s) of error, this Court will not divide the costs of reproducing the record. *W.Va.R.App.P.* 8(d).[12]

For the foregoing reasons, the final order of the trial court is affirmed.

AFFIRMED.

12. By this opinion we do not countenance, in the typical civil case, a blanket designation of  the entire trial court file.