BUFFALO MINING COMPANY,

*a corporation*

*v.*

JAMES MARTIN,

*et al.*

(No. 14348)

Decided April 4, 1980.

Dissenting Opinion July 9, 1980.

*James W. St. Clair, Marshall & St. Clair,* for appellants.

*John C. Valentine, William G. Wilson, Valentine, Wilson & Partain,* for appellee.

MILLER, JUSTICE:

James and Toni Martin, surface owners of property situated in Wayne County, appeal a judgment of the Circuit Court of Wayne County permitting Buffalo Mining Company [Buffalo], lessee of coal beneath the Martins' land, to construct an electric transmission line on the surface. The central issue is whether Buffalo had the authority under its mining rights to construct the power line. For the reasons set forth, we affirm the judgment.

Buffalo acquired its mining rights in a coal lease in 1969 from Wayne County Land and Mineral Company, which obtained the coal and other mineral rights underlying the Martins' property from the successors in interest of the grantees of an 1890 mineral severance deed. The key clause in the 1890 deed relates to the right of the mineral owner to utilize the surface of the land in connection with mining activities.[1]

---

[1] The grantees in the 1890 severance deed were given "all the coal, fire-clay, and other minerals, oils, gases and other fluid or volatile substances in, on, and underlying all the following described real estate ... together with the right and privilege of mining ... and of removing and taking away the entire amount and body of the same ... and with all proper and reasonable rights and privileges for ventilating and draining the mines and wells ... together, also, with the right of erecting and maintaining upon said land all buildings, oil tanks, machinery, telephone and telegraph lines, and other improvements necessary or convenient for the operations upon said lands ... with the right, also, to use the water, timber, stone, rock and sand upon said land necessary for

Buffalo is involved in mining a large tract of coal, part of which is located under the Martins' property. In order to facilitate the ventilation of its coal mine, Buffalo hired a construction company to erect an electric transmission line on the Martins' land. Appellant James Martin obstructed the project. On the basis of its assertion that the power line was necessary for ventilation of the mine, Buffalo sought and was granted a temporary and then a permanent injunction from the Circuit Court of Wayne County which prohibited the Martins from interfering with the erection of the line. It is from this judgment that the Martins appeal.

The Martins assert two grounds for reversing the Circuit Court. First, they contend that the transmission line will be used to supply power to a mine ventilation shaft built by Buffalo outside the boundaries of the Martins' land. They urge that the power line easement is not for any mining purpose within their tract, and consequently not encompassed in the severance rights of the 1890 deed. They further contend that the power line as constructed constitutes an unreasonable use of the surface. Second, the Martins assert that the 1890 deed is silent as to the right of the mineral grantees, and those claiming under them, to erect an electric power line, and that, from a technological standpoint, such use would not have been contemplated by the parties to the severance deed.

I

Initially, we do not address the first contentions raised by the Martins, simply because the record reveals

mining, building, boring, or other purposes connected with the operations on the premises, together, also, with all necessary rights of way in, on, through and over the said lands, to and from said mines, wells, oil tanks, buildings and other improvements; and the rights and privileges of constructing, operating and maintaining in, on, through and over said lands such railroads and other roads and pipe lines as may be necessary or convenient for the successful working and operating of the said mines, wells, oil tanks, buildings and other improvements, or for the transportation of coal, fire-clay, minerals, oil, gas, and other substances."

that the Martins did not advance these issues, which are factual in nature, in the trial court. They are: whether the power line was constructed in an unreasonable manner and whether such an easement could be used for mining operations outside the boundaries of the Martin property. Buffalo alleged in Paragraph 5 of its complaint that the ventilation shaft for the mine was legally required[2] in "the ordinary course of . . . the mining of coal from [Buffalo's leasehold interests], including the coal underlying [the Martins' land]." The Martins in their answer stated they were "without knowledge or information" as to this allegation.

The final order of the Circuit Court, however, reflects that at the time the case was submitted, "[c]ounsel for [the Martins] stated to the Court that there was no factual issue for decision by the Court since the factual allegations of the Bill of Complaint were not disputed by [the Martins], and could be taken and treated as true. . . ." The Martins contended at oral argument before this Court that this statement in the final order was incorrect. The involved language in the order was a factual conclusion to the effect that the parties did not have any factual dispute.

No discovery was taken by either party and no evidentiary hearing was held. The matter was submitted to the trial court solely on one legal issue, whether the deed language was sufficiently broad to encompass an implied easement for an electric line on the surface of the Martin property. The court concluded that such an easement could be implied from the severance deed.

The Martins made no motion under Rule 52(b) of the West Virginia Rules of Civil Procedure (RCP), for an amendment to that portion of the order finding that there was no factual dispute between the parties. Nor was any subsequent motion made under Rule 60, RCP, to obtain relief because of error or mistake in the trial court's findings. Absent such procedures, "[t]his Court

---

[2] *See* W. Va. Code, §§ 22-2-2 to 22-2-5. Buffalo also asserted that federal law mandates the ventilation shaft.

will not consider questions, nonjurisdictional in their nature, which have not been acted upon by the trial court." Syllabus Point 4, *Wheeling Downs Racing Association v. West Virginia Sportservice, Inc.*, 157 W.Va. 93, 199 S.E.2d 308 (1973), *appeal after remand*, 158 W.Va. 935, 216 S.E.2d 234 (1975). *Accord, Dixon v. American Industrial Leasing Co.*, 157 W.Va. 735, 205 S.E.2d 4 (1974); *Hamilton Watch Co. v. Atlas Container, Inc.*, 156 W.Va. 52, 190 S.E.2d 779 (1972); *City of Huntington v. Chesapeake & Potomac Tel. Co.*, 154 W.Va. 634, 177 S.E.2d 591 (1970).

## II

In determining whether the 1890 deed can be construed by implication to permit a surface easement for an electric line, we note that the deed language in regard to surface use is rather comprehensive and includes the right to "telephone and telegraph lines."

It is generally recognized that where there has been a severance of the mineral estate and the deed gives the grantee the right to utilize the surface, such surface use must be for purposes reasonably necessary to the extraction of the minerals. *Adkins v. United Fuel Gas Co.*, 134 W.Va. 719, 61 S.E.2d 633 (1950); *Squires v. Lafferty*, 95 W.Va. 307, 121 S.E. 90 (1924); *Porter v. Mack Manufacturing Co*, 65 W. Va. 636, 64 S.E. 853 (1909); 54 Am. Jur. 2d *Mines and Minerals* § 210; 58 C.J.S. *Mines and Minerals* § 159; R. Donley, *Coal Mining Rights and Privileges in West Virginia*, 52 W.Va. L. Rev. 32 (1949).

Appellants rely heavily on three decisions in which this Court refused to interpret language granting surface rights in connection with deep mining as including the right to strip or auger the surface for coal. *Brown v. Crozer Coal & Land Co.*, 144 W.Va. 296, 107 S.E.2d 777 (1959); *Oresta v. Romano Bros., Inc.*, 137 W.Va. 633, 73 S.E.2d 622 (1952); *West Virginia-Pittsburgh Coal Co. v. Strong*, 129 W.Va. 832, 42 S.E.2d 46 (1947). These decisions were each based on two grounds. First, at the time of the original severance deed, neither strip nor auger mining was known and therefore could not have been

within the contemplation of the parties. Second, and of even more importance, was the fact that these mining methods virtually destroyed the surface for its normal use, as stated in *Strong:*

> "Certainly if the owner of the surface has a proprietary right to subjacent support (36 Am. Jur. 405), he has at least an equal right to hold intact the thing to be supported, i.e., the surface, in the absence of a clearly expressed intention to the contrary." [129 W.Va. at 837, 42 S.E.2d at 50].

We do not believe that these three decisions are controlling in the present case. The issue here presented involves no claim of any widespread destruction of the surface, but whether the utilization of the surface for an electric power line can be inferred as a reasonable use within the context of the severance deed language.

We are not cited any direct authority on this question from our past decisions. The issue appears to have been raised elsewhere in only a few cases. *Creasey v. Pyramid Coal Corp.*, 116 Ind. App. 124, 61 N.E.2d 477 (1945), involved a 1905 severance deed which contained rather broad surface easements for mining but did not provide the right for an electric power line. Finding the right to such an easement by implication, the court stated:

> "At the time of the grant, the operation of coal mining machinery by electricity was unknown. There was, therefore, no necessity for mentioning this type of motivating power and the appurtenances necessary for its delivery nor for excluding them. The terms of the grant are so broad and all inclusive that it is clear to us that the grantors intended to give the grantees any and all rights reasonably necessary to the maintenace and operation of the said mine and, indeed, they included therein everything which at that time was known to be reasonably necessary ...." [116 Ind. App. at 130, 61 N.E.2d at 479-80].[3]

---

[3] The technological evolution approach has been taken in cases involving other kinds of easements, *see, e.g., Bernards v. Link,* 199

The only other authority cited is Kentucky, where, without extensive discussion, the court found that general language in the severance deed granting the mineral owner the right to use portions of the surface in connection with mining activity was sufficient to permit an implied easement for electric power lines to supply power for the underground mining operation. *Trivette v. Consolidation Coal Co.*, 296 Ky. 529, 177 S.W.2d 868 (1944); *Flannery v. Utilities Elkhorn Coal Co.*, 282 Ky. 355, 138 S.W.2d 988 (1940); *Wells v. North East Coal Co.*, 255 Ky. 63, 72 S.W.2d 745 (1934); *See* Note, 66 W.Va. L. Rev. 26 (1963).

It would appear from the foregoing cases that where the severance deed contains broad rights for utilization of the surface in connection with underground mining activities and these broad rights are coupled with a number of specific surface uses, courts will be inclined to imply compatible surface uses that are necessary to the underground mining activity. This principle is stated in 54 Am. Jur. 2d *Mines and Minerals* § 210:

> "The implied right to occupy so much of the surface as may be needed to open and work the mines is not limited, but rather strengthened, by a special grant of certain timber and water privi-

---

Ore. 579, 248 P.2d 341 (1952), *aff'd on rehearing*, 199 Ore. 605, 263 P.2d 794 (1953) (railroad); *Stevens v. Anderson*, 393 A.2d 158 (Me. 1978) (footpath and cattle crossing); *see also Bard Ranch Co. v. Weber*, 557 P.2d 722, 731 (Wyo. 1976); *see generally* 3 A.L.R. 3d 1256 (1965); 3 R. Powell, *Real Property* § 415 (1979 ed.). It is apparent that this argument is not the real basis for the courts' holding; otherwise, it would be consistently applied. In the foregoing cases and *Creasey v. Pyramid Coal Corp.*, 116 Ind. App. 124, 61 N.E.2d 477 (1945), the courts find that the parties' failure to comprehend the technological advance is a reason to imply the easement. In *West Virginia-Pittsburgh Coal Co. v. Strong*, 129 W. Va. 832, 42 S.E. 2d 46 (1947), and its progeny, we indicated that from a technological standpoint the parties could not contemplate strip and auger mining, and therefore the technological advance would not be allowed. The fundamental basis for all of the decisions is whether the easement sought was substantially compatible with the surface rights granted to the mineral owner and whether it substantially burdens the surface owner's estate.

leges and of a right of way to and from the mines. . . ."

It is perhaps this rule that harmonizes the different results reached by this Court in two cases containing rather similar easement claims. In *Davis v. Jefferson County Tel. Co.*, 82 W.Va. 357, 95 S.E. 1042 (1918), the owner of a private right of way had contracted with the telephone company to install a telephone line along the right of way to his farmhouse. Suit was filed by the owner of the servient estate, over which the right of way crossed, to block construction of the telephone line on the basis that it created an additional burden on the right of way. In rejecting this contention, we stated in Syllabus Point 1:

> "Generally where a right of way is granted or reserved without limitations upon its use it may be used for any purpose to which the land accommodated thereby may naturally and reasonably be devoted, and the grantee thereof is entitled to vary his mode of enjoying the same and from time to time avail himself of modern inventions, if by so doing he can more fully exercise and enjoy or carry out the object for which the easement was granted or reserved."

In *Armstrong v. Pinnacle Coal & Coke Co.*, 101 W.Va. 15, 131 S.E. 712 (1926), the coal company had only an easement for drainage of water from its mining operations and sought to erect a power line along a road which crossed the plaintiff's land. We held that since the coal company had no interest in the road, it had no right under its easement to maintain the line. Thus, the broader the easement right granted, as in *Davis*, the more likely a related implied easement will be found, in contrast with *Armstrong*, where only a single limited easement was granted.

Despite statements in *West Virginia-Pittsburgh Coal Co. v. Strong*, 129 W.Va. 832, 42 S.E.2d 46 (1947), that the grant of express mining easements restricts or negates implied rights, we do not believe this principle to be controlling in the present case. First, in addition to a

number of express surface rights, including the compatible use of telephone and telegraph lines, the severance deed sets forth the general grant· of "all proper and reasonable rights and privileges for ventilating and draining the mines and wells." Moreover, we believe that *Strong* was correctly decided on the more fundamental principle that a right to surface use will not be implied where it is totally incompatible with the rights of the surface owner.

Our past cases have demonstrated that any use of the surface by virtue of rights granted by a mining deed must be exercised reasonably so as not to unduly burden the surface owner's use. *Adkins v. United Fuel Gas Co.*, 134 W.Va. 719, 61 S.E.2d 633 (1950); *Porter v. Mack Manufacturing Co.*, 65 W.Va. 636, 64 S.E. 853 (1909); *cf. Mckell v. Collins Colliery Co.*, 46 W.Va 625, 33 S.E. 765 (1899).

We conclude that where implied as opposed to express rights are sought, the test of what is reasonable and necessary becomes more exacting, since the mineral owner is seeking a right that he claims not by virtue of any express language in the mineral severance deed, but by necessary implication as a correlative to those rights expressed in the deed. In order for such a claim to be successful, it must be demonstrated not only that the right is reasonably necessary for the extraction of the mineral, but also that the right can be exercised without any substantial burden to the surface owner. *Porter v. Mack Manufacturing Co., supra.* This concept has been most clearly articulated in oil and gas cases. *See, e.g., Flying Diamond Corp. v. Rust*, 551 P.2d 509 (Utah 1976) (surface easement "consistent with allowing the fee owner the greatest possible use of his property"); *Getty Oil Co. v. Jones*, 470 S.W.2d 618 (Tex. 1971); Annot., 53 A.L.R.3d 16 (1973).[4]

---

[4] We do not, nor do other courts, make a distinction between the extent of the right to surface use under coal severance deeds and oil and gas or other mineral severances. *Adkins v. United Fuel Gas Co.*, 134 W.Va. 719, 61 S.E.2d 633 (1950); *Flying Diamond Corp. v. Rust*, 551 P.2d 509 (Utah 1976); *Getty Oil Co. v. Jones*, 470 S.W.2d 618 (Tex. 1971).

As we earlier noted, the factual issues of undue burden and reasonable necessity were not raised by the Martins in the trial court, and are not before us now.

Based upon the record before us, for the reasons herein stated, we affirm the judgment of the trial court.

*Affirmed.*

HARSHBARGER, JUSTICE, *dissenting:*

When one reads the syllabus points here, one would think this landowner prevailed in his effort to avoid having an electric line strung across his property. But such is not the case, because we have embraced an Indiana rule that effectively negates our prior cases upon the proposition that a broad grant or reservation of a right to use surface land, by the owner of mineral, does *not* place within the uses those that came into being years later that were not within the contemplation of the parties at the time the grant or reservation was made.

In *West Virginia-Pittsburgh Coal Co. v. Strong,* 129 W.Va. 832, 42 S.E.2d 46 (1947), the words conferring on a mineral grantee, rights to use the surface, were:

> The severance of the coal from the remaining freehold occurred in a deed from W. H. Boyd to Bernard W. Lewis and G. B. Findley, dated May 31, 1904, which, following the conveyance of all of the coal underlying the 127.74 acre tract, contained the following provisions:
>
> > "Together with the right to enter upon and under said land with employees, animals and machinery at convenient point and points, and to mine, dig, excavate and remove all said coal, and to remove and convey from, upon, under and through, said land all said coal and the coal from other land and lands and to make and maintain on said land all necessary and convenient structures, roads, ways, and tramways, rail-

roads, switches, excavations, air-shafts, drains and openings, for such mining, removal and conveying of all coal aforesaid, with the exclusive use of all such rights of way and privileges aforesaid, including right to deposit mine refuse on said land and waiving all claims for injury or damage done by such mining and removal of coal aforesaid and use of such privileges.

"All of the surface of the said land occupied or used by the said parties of the second part, or their assigns, above the level of the Pittsburg [sic] #8 vein of coal, for their operations herein shall be paid for before the same shall be so used, or occupied, at the rate of One Hundred Dollars per acre, and said party of the first part, his heirs or assigns shall execute and deliver a deed therefor, in fee simple, free from liens and incumbrances, when said surface shall be taken and paid for."

*Id.*, at 833.

The fight was about whether these words allowed the mineral owner to strip-mine part of the acreage.

We are of the opinion, arrived at by reading the instrument as a whole, that it was the manifest intention of the parties to preserve intact the surface of the entire tract, subject to the use of the owner of the coal "at convenient point or points" in order "to mine, dig, excavate and remove all of said coal" by the usual method at that time known and accepted as common practice in Brooke County. We do not believe that this included the practice known as strip mining.

*Id.*, at 836.

And the first syllabus states:

In order for a usage or custom to affect the meaning of a contract in writing because within the contemplation of the parties thereto, it must be shown that the usage or custom was one generally followed at the time and place of the contract's execution.

Our majority, however, displaces the intention of the parties as a controlling factor, and somehow finds that the *West Virginia-Pittsburgh Coal* decision was based on some subliminal, perhaps primordial, unspoken instinct of that court that it was balancing the burdens of the rights sought by the mineral owner with use of the surface by the owner thereof.

Well, English teachers seek, and find, underlying meanings in the simplest couplets; astrologists interpret the movements of the stars; and preachers of the Gospel sometimes divine from the Holy Writ, messages that few other mortals can perceive. And how this court can extract from the words, "... it was the manifest intention of the parties ..." a conclusion that the declaiming court was really balancing something, is beyond me. That will be a handy way in the future for courts to make their own contracts out of about anything that is brought before them.

We have, therefore, here, simply done away with parties' intentions; and left what happens to them to turn upon courts' ideas of what is best for them, balancing this or that. Justice's Scales were never intended to be a device representing a means for courts to substitute their judgments for the clearly expressed intentions of contracting parties.

I am authorized to say that Justice McGraw agrees with this Dissent and joins me in it.