445 S.E.2d 742

**Sharon L. MACKEY, Administratrix of the Estate of Tonya L. Mackey, Plaintiff Below, Appellee,**

v.

**Oscar S. IRISARI, M.D., and Reynolds Memorial Hospital, Inc., Defendants Below, Appellees.**

**Oscar S. IRISARI, Third–Party Plaintiff Below, Appellee,**

v.

**Jesus T. HO, M.D., Third–Party Defendant Below, Appellant.**

**No. 21915.**

Supreme Court of Appeals of West Virginia.

Submitted Feb. 8, 1994.

Decided June 2, 1994.

---

R. Noel Foreman, Jeffrey A. Grove, Bachmann, Hess, Bachmann & Garden, Wheeling, for appellant Jesus T. Ho, M.D.

Linda M. Bordas, James B. Stoneking, Bordas, Bordas & Jividen, Wheeling, for appellee Sharon L. Mackey.

Richard W. Stuhr, Dino S. Colombo, Jacobson, Maynard, Tuschman & Kalur, Charleston, for appellee Oscar S. Irisari, M.D.

James A. McKowen, Member, WVTLA Amicus Curiae Committee, Charleston, amicus curiae.

McHUGH, Justice:

This case is before the Court upon the appeal of Jesus T. Ho, M.D., the third-party defendant below, from the December 28, 1992, order of the Circuit Court of Marshall County which denied his post trial motions in a medical malpractice action. The appellees are Sharon L. Mackey, Administratrix of the Estate of Tonya L. Mackey, the plaintiff below, and Oscar S. Irisari, M.D., the defendant and third-party plaintiff below. For reasons set forth below, we affirm the circuit court's order.

## I.

The plaintiff's daughter, Tonya L. Mackey, had worked as a receptionist for Dr. Ho, who is an internist in Moundsville, for approximately four years before the events which led to this action. In September of 1988, Dr. Ho ordered an upper gastrointestinal study and an oral cholecystogram after Ms. Mackey complained of abdominal discomfort, nausea, and vomiting. The tests came back normal, and Dr. Ho did nothing further, even though Ms. Mackey's symptoms continued.

On October 3, 1988, Ms. Mackey went to see Dr. Irisari, a specialist in obstetrics and gynecology, who ordered an ultrasound. Dr. Irisari thought the ultrasound revealed a possible ruptured ovarian cyst, tubo-ovarian abscess or ectopic pregnancy. Dr. Irisari scheduled exploratory surgery for October 5, 1988.

In the morning of October 4, 1988, Ms. Mackey went to the emergency room because her condition had worsened. That evening Dr. Irisari performed surgery on Ms. Mackey and discovered a ruptured appendix. After surgery Ms. Mackey went into septic shock. However, Dr. Irisari failed to diagnose or treat Ms. Mackey's symptoms of septic shock. Dr. Irisari realized on October

6, 1988, that Ms. Mackey was not recuperating from her surgery, so he requested a consultation from Dr. Ho. Dr. Irisari alleges that Dr. Ho also failed to properly treat Ms. Mackey.

On October 7, 1988, Dr. Irisari requested a consultation from Dr. Victorino Chin, a general surgeon. Dr. Chin returned Ms. Mackey to the operating room. However, Ms. Mackey's condition continued to deteriorate. Ms. Mackey died on October 19, 1988, at age twenty-three.

The plaintiff filed suit against Dr. Irisari and Reynolds Memorial Hospital. Dr. Irisari filed a third-party contribution action against Dr. Ho. Dr. Irisari admitted that he was negligent in his post-operative treatment of Ms. Mackey. Dr. Ho's expert testified that Dr. Ho was negligent in his treatment of Ms. Mackey. Dr. Ho also testified that he was negligent.

Reynolds Memorial Hospital settled the case for $130,000. Eventually, Dr. Irisari entered into a "Mary Carter" type agreement in which he agreed to pay the plaintiff a minimum of $1,000,000.00 regardless of the outcome of the case.[1] He also agreed to remain an active party in the case in order to pursue his contribution claim against Dr. Ho.

The trial court directed a verdict against Dr. Ho on liability, so the only issues before the jury were the apportionment of negligence and damages. The jury awarded the plaintiff $1,842,128.48 and apportioned 51% of the fault to Dr. Irisari and 49% to Dr. Ho. The trial court entered judgment on Dr. Irisari's contribution claim against Dr. Ho for $838,942.95.

## II.

The first issue involves determining how much Dr. Irisari can collect from Dr. Ho

in his contribution action. Essential to that determination is an understanding of how the trial court calculated the final judgment.

| | | |
|---|---|---|
| $ | 1,000,000.00 | Solatium[2] |
| $ | 785,550.00 | Lost Future Earnings |
| $ | 37,908.95 | Medical Expenses |
| $ | 2,504.25 | Funeral Expenses |
| $ | 16,165.28 | Prejudgment interest on special damages |
| $ | 1,842,128.48 | SUB–TOTAL |
| $– | 130,000.00 | Settlement from Reynolds Memorial |
| $ | 1,712,128.48 | TOTAL JUDGMENT AWARDED |

As we pointed out in the facts, the jury found Dr. Ho to be 49% at fault, and Dr. Irisari to be 51% at fault. The trial court then ascertained Dr. Ho's share of the total judgment after deducting the settlement from Reynolds Memorial: $1,712,128.48 times 49% = $838,942.95. Dr. Irisari's share of the judgment would have been $1,712,128.48 times 51% = $873,185.52. Therefore, since Dr. Irisari entered into a "Mary Carter" type agreement and settled for a minimum of $1,000,000.00, he paid $126,814.48 more than he would have had he not settled ($1,000,000.00 – $873,185.52 = $126,814.48).

Dr. Ho argues that based on the following language found in *W.Va.Code*, 55–7B–9(c) [1986], in part, of the Medical Professional Liability Act that he is responsible only for $126,814.48, which is the difference between the minimum Dr. Irisari paid in his settlement ($1,000,000.00) and the amount he would have been responsible for under the jury verdict ($873,185.52):

shall rebate to Dr. Irisari a sum equal to the percentage of fault assigned to Dr. Ho by the jury multiplied by $1,000,000.00 and for that portion of the verdict which is in excess of $1,130,000.00, the plaintiff will rebate to Dr. Irisari a sum of $.50 for every dollar of such excess.

**1.** Under the terms of the "Mary Carter" settlement agreement, Dr. Irisari is to pay $1,000,000.00 to the plaintiff regardless of the outcome of the case. Dr. Irisari is entitled to retain the amount collected from Dr. Ho in the contribution claim if the verdict of the jury is less than or equal to $1,130,000.00. However, if the jury returns a verdict for more than $1,130,000.00, Dr. Irisari will pay all sums collected from Dr. Ho to the plaintiff, and the plaintiff will make the following rebate: for that portion of the verdict which is less than $1,130,000.00 the plaintiff

**2.** Solatium has been defined as "[d]amages allowed for injury to the feelings." *Black's Law Dictionary* 1391 (6th ed. 1990).

A right of contribution exists in favor of each defendant who has paid to a plaintiff more than the percentage of the total dollar amount awarded attributable to him relative to the percentage of negligence attributable to him. *The total amount of recovery for contribution is limited to the amount paid by the defendant to a plaintiff in excess of the percentage of the total dollar amount awarded attributable to him.*

(emphasis added). The trial court, however, entered judgment against Dr. Ho for $838,942.95 which is his 49% share of the final judgment awarded by the jury. The question before us is simply which figure should Dr. Ho be responsible for: $126,814.48 or $838,942.95. However, we find that the more fundamental question is whether in this kind of arrangement contribution can ever be collected.

 Our case law reveals that we recognize that "[i]n West Virginia one joint tortfeasor is entitled to contribution from another joint tort-feasor, except where the act is *malum in se.*" Syl. pt. 3, *Haynes v. City of Nitro,* 161 W.Va. 230, 240 S.E.2d 544 (1977). Furthermore, in syllabus point 3 of *Sitzes v. Anchor Motor Freight, Inc.,* 169 W.Va. 698, 289 S.E.2d 679 (1982), we recognized that "[a]s between joint tortfeasors, a right of comparative contribution exists *inter se* based upon their relative degrees of primary fault or negligence." Additionally, we explained the principles of contribution in syllabus point 4 of *Sydenstricker v. Unipunch Products, Inc.,* 169 W.Va. 440, 288 S.E.2d 511 (1982):

> The doctrine of contribution has its roots in equitable principles. The right to contribution arises when persons having a common obligation, either in contract or tort, are sued on that obligation and one party is forced to pay more than his *pro tanto* share of the obligation. One of the essential differences between indemnity and contribution is that contribution does not permit a full recovery of all damages paid by the party seeking contribution.

*Recovery can only be obtained for the excess that such party has paid over his own share.*

(emphasis added).[3]

A comparison between the above syllabus point and *W.Va.Code,* 55–7B–9(c) [1986], in part, reveals that *W.Va.Code,* 55–7B–9(c) [1986] merely codifies what we stated in syllabus point 4 of *Sydenstricker.* Both the above syllabus point and the code section limit a party's right to contribution to the amount that the party has paid in excess of his own share.

Settlements, however, add another twist to the contribution issue. For instance, in syllabus point 6 of *Board of Educ. v. Zando, Martin & Milstead, Inc.,* 182 W.Va. 597, 390 S.E.2d 796 (1990), we stated that "[a] party in a civil action who has made a good faith settlement with the plaintiff prior to a judicial determination of liability is relieved from any liability for contribution."

However, in syllabus point 6 of *Reager v. Anderson,* 179 W.Va. 691, 371 S.E.2d 619 (1988), we recognized that a nonsettling defendant may still collect contribution from a defendant who has settled under a "Mary Carter" settlement agreement: "In a case in which a settling defendant, pursuant to a 'Mary Carter' settlement agreement, remains an active party and incurs a joint judgment, a verdict for the plaintiff will be reduced by the amount guaranteed in the settlement, and the defendants' right to comparative contribution will be preserved." However, this case differs from *Reager.*

In *Reager,* the two defendants incurred a joint judgment. Dr. Anderson, one of the defendants, entered into a "Mary Carter" settlement agreement with the plaintiff. Dr. Melia, the other defendant, remained in the case and was responsible for the remainder of the verdict returned for the plaintiff once the settlements were set-off from the original verdict. The jury found Dr. Anderson to be 45% at fault and Dr. Melia to be 55% at fault. Dr. Melia then wanted contribution from Dr. Anderson for the amount that he paid above

---

**3.** We explained the differences between the *per capita, pro tanto,* and equitable methods of handling partial settlements in *Reager v. Anderson,* 179 W.Va. 691, 703 n. 9, 371 S.E.2d 619, 631 n. 9 (1988).

his share of the verdict. This Court found that Dr. Melia could collect the amount that he paid above his share from Dr. Anderson even though Dr. Anderson had entered into a "Mary Carter" settlement agreement since Dr. Anderson had remained in the case and incurred a joint judgment. *Id.*

In the case before us, we do not have a co-defendant who incurred a joint judgment. Dr. Ho is not responsible to the plaintiff for any of the verdict since the plaintiff never sued him. Furthermore, it is the settling defendant who is seeking contribution, unlike the *Reager* case in which the defendant who entered into the "Mary Carter" settlement agreement had to pay contribution.

In *Reager* we approved of the collection of contribution from a defendant who had settled pursuant to a "Mary Carter" settlement agreement where there are co-defendants who incur a joint judgment. However, we could not find nor did the parties provide us with a case which discusses whether a party settling pursuant to a "Mary Carter" settle-

ment agreement can still pursue contribution from a third-party defendant.[4]

We provided for a third-party action for contribution in *Haynes*, 161 W.Va. at 234, 240 S.E.2d at 547, when we pointed out that the absence of a joint judgment does not foreclose contribution between joint tortfeasors. However, *Haynes* did not note whether a defendant who had settled pursuant to a "Mary Carter" settlement agreement could seek contribution from a third-party defendant. Moreover, the parties in the case before us did not question the validity of the contribution claim, but instead, merely questioned the amount of contribution to the judgment.

The difficulty in this case arose when the parties focused on the amount of damages to be paid by each defendant rather than on whether Dr. Irisari's contribution claim should have been dismissed once he entered into the "Mary Carter" settlement agreement. However, we held in syllabus point 3 of *Wells v. Roberts*, 167 W.Va. 580, 280 S.E.2d 266 (1981) that "[a]s a general rule

**4.** In *Stein v. American Residential Management, Inc.*, 781 S.W.2d 385 (Tex.Ct.App.1989), *error is denied with per curiam opinion*, 793 S.W.2d 1 (Tex.1990), a case similar to *Reager, supra*, the Court of Appeals of Texas allowed the nonsettling defendant to collect contribution from a defendant who had settled pursuant to a "Mary Carter" settlement agreement. In another case which did not involve a "Mary Carter" settlement agreement, the Supreme Court of Texas held that the defendants who settled a plaintiff's entire claim could not preserve a right to contribution from a joint tortfeasor who did not participate in the settlement. *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19 (Tex.1987). However, it is unclear as to whether the Texas courts would allow the defendant who settled pursuant to a "Mary Carter" agreement to collect contribution from a nonsettling defendant whether a third-party defendant or not.

Even if we examine cases which involve the right to contribution when there has been a settlement which is not a "Mary Carter" type settlement, a bright-line rule does not emerge. For instance, the Uniform Contribution Among Tortfeasors Act found in 12 U.L.A. 63 (1975) states in § 1(d):

A tortfeasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor whose liability for the injury or wrongful death is not extinguished by the settlement nor in respect to any amount paid in a settlement which is in excess of what was reasonable.

To simplify what § 1(d) above states, we will call the plaintiff "A," the first defendant "B," and the second defendant "C." If B settles only his share of the claim with A, then B cannot pursue contribution from C.

Additionally, 18 Am.Jur.2d *Contribution* § 70 (1985) states:

Although it has been held that a joint tortfeasor, who enters into a settlement of the common liability with an injured person, is entitled to recover contribution from another tortfeasor, whose liability to the injured person was extinguished by that settlement, it may be provided by statute that a settling joint tortfeasor may not obtain contribution from another joint tortfeasor whose liability was not extinguished by the settlement.

(footnotes omitted). Again, to simplify what § 70 states, we will use A, B and C. If B settles the entire claim with A so that A cannot pursue anything from C, then B may have a right to contribution from C unless a statute provides that B cannot collect contribution from C if C's liability was not extinguished by the settlement. *See Obray v. Mitchell*, 98 Idaho 533, 567 P.2d 1284 (1977) and *City of Tucson v. Superior Court*, 165 Ariz. 236, 798 P.2d 374, 378 (1990).

The above discussion reveals that the right to contribution when there has been a settlement depends upon each jurisdiction's statutes and case law. The advent of comparative negligence also affects this issue.

'[t]his Court will not consider questions, non-jurisdictional in their nature, which have not been acted upon by the trial court.' Syl. pt. 1, *Buffalo Mining Co. v. Martin,* [165 W.Va. 10,] 267 S.E.2d 721 (W.Va.1980)." Therefore, since the parties focused their attention on the amount of damages, we, too, will focus our attention on that issue. Furthermore, since the case before us was tried under the assumption that it was like *Reager, supra,* and further under the assumption that the parties were co-defendants for the purpose of determining each defendant's share of damages, we will treat the case as if Dr. Ho and Dr. Irisari incurred a joint judgment, especially since there is nothing before us which indicates that the parties objected to the case being tried in this manner.

For instance, the trial court stated the following during his charge to the jury:

The mere fact that the Plaintiff chose not to sue Dr. Ho has no bearing whatsoever on this claim....

Your duty, after deciding this issue in regard to Dr. Ho, is simple, you just determine, weigh and compare the intent of the negligence of each physician in this case; determine by percentage how much each physician's deviation or deviations from the standard of care contributed to the death of Tonya Mackey, up to one hundred per-cent. This is known as comparative negligence, and the effect of your findings will be that each physician will pay the same percentage of the verdict awarded by you to the Plaintiff as you find to be the comparative fault of each physician.

Additionally, the verdict form indicates that the jury determined the percentage of fault attributable to each defendant and awarded judgment as if it were against both defendants.[5]

Dr. Ho argues that based on *W.Va.Code,* 55–7B–9(c) [1986] he should only have to pay Dr. Irisari the excess of what Dr. Irisari paid in the settlement over his share. However, *W.Va.Code,* 55–7B–9(c) [1986] states, in part, that "[t]he total amount of recovery for contribution is limited to the amount paid by the defendant to a plaintiff in excess of the percentage of the total dollar amount *awarded* attributable to him." (emphasis added). Because of the legislature's use of the word, "awarded," the above language in *W.Va. Code,* 55–7B–9(c) [1986] is premised upon a judgment being entered and not a settlement being agreed upon.

*W.Va.Code,* 55–7B–9(c) [1986] simply states that if Dr. Irisari and Dr. Ho had been co-defendants, then Dr. Ho would never be responsible for more than his proportionate share. The trial court did not, in the case

---

5. Below, in part, is the verdict order the jury returned:

[T]he jury retired for its deliberations, and returned the following verdict:

'*Interrogatory No. 1:* Using 100% to represent the total negligence of the parties, apportion the negligence between the Defendant, Oscar S. Irisari, M.D., and the Third–Party Defendant, Jesus T. Ho, M.D.

| | |
|---|---|
| Oscar S. Irisari, M.D. | 51% |
| Jesus T. Ho, M.D. | 49% |
| Total | 100% |

'*Interrogatory No. 2:* State the amount of damages which you find, from a preponderance of the evidence the survivors of Tonya L. Mackey are entitled to recover for the grief, sorrow, mental anguish and emotional distress they have experienced and will continue to experience as a result of the death of Tonya L. Mackey, as well as the loss of Tonya L. Mackey's society, comfort, guidance, advice that they have experienced and will continue to experience as the result of the death of Tonya Mackey:

| | | |
|---|---|---|
| Sharon L. Mackey ) | | $200,000.00 |
| James Mackey ) | | $200,000.00 |
| Troy Mackey ) | $1,000,000.00 | $200,000.00 |
| Roy Mackey ) | | $200,000.00 |
| Katreni Mackey ) | | $200,000.00 |

'*Interrogatory No. 3:* State the amount of damages that you find should be awarded as a result of the loss of the reasonably expected income of Tonya Mackey.

$785,550.00

'*Interrogatory No. 4:* State the amount of damages that you find the plaintiff is entitled to recover as a result of the hospital and medical bills and expenses incurred by Tonya Mackey from the time of her admission at Reynolds Memorial Hospital, Inc. on October 4, 1988, until the time of her death.

$ 37,908.95

'*Interrogatory No. 5:* State the amount of damages that you find the plaintiff is entitled to recover as a result of the reasonable funeral expenses of Tonya Mackey.

$ 2,504.25

Date: Oct. 19, 1992 S/Edward W. West

Foreperson'.

before us, make Dr. Ho responsible for more than his proportionate share. Under the principles of *Reager, supra,* Dr. Ho and Dr. Irisari incurred, what could be considered under the circumstances of the case, a joint judgment of $1,712,128.48 once the settlement from Reynolds Memorial was deducted. Therefore, Dr. Ho owed Dr. Irisari 49% of $1,712,128.48 which is $838,942.95 since the jury found Dr. Ho to be responsible for 49% of the plaintiff's damages. Accordingly, we affirm the trial court's award of $838,942.95 on Dr. Irisari's contribution claim.

This case points out the problems with a "Mary Carter" settlement agreement. We are not revisiting the propriety of the "Mary Carter" settlement agreement in this case, but we are pointing out the perils if the parties rely too extensively on a "Mary Carter" settlement agreement. We note that if Dr. Ho had questioned the legitimacy of Dr. Irisari's contribution claim once he settled pursuant to a "Mary Carter" settlement agreement, the result may have been different.

### III.

█ The second issue is whether the trial court erred by refusing to disclose the fact and terms of the "Mary Carter" settlement agreement to the jury. For reasons explained below, we affirm the trial court's decision.

We have thoroughly discussed this issue in previous cases. In *State ex rel. Vapor Corp. v. Narick,* 173 W.Va. 770, 772, 320 S.E.2d 345, 347-8 (1984), we outlined the attributes of a "Mary Carter" settlement agreement:

'1. The agreeing defendants must remain in the action in the posture of defendants.

2. The agreement must be kept secret.

3. The agreeing defendants guarantee to the plaintiff a certain monetary recovery regardless of the outcome of the lawsuit.

4. The agreeing defendants' liability is decreased in direct proportion to the increase in the nonagreeing defendants' liability.'

(citation omitted). None of the parties in the case before us dispute that this is a "Mary Carter" settlement agreement.

█ In *Riggle v. Allied Chemical Corp.,* 180 W.Va. 561, 566, 378 S.E.2d 282, 287 (1989), we noted that "when a trial court is confronted with a 'Mary Carter' type settlement agreement, the court must first verify that the agreement does not contravene some law or public policy, and then determine whether the agreement should be disclosed to the jury to avoid unfair prejudice to the nonsettling defendant."[6] We recognize that "it is commonly held that the jury should be informed of the general nature of the ["Mary Carter"] compromise agreement so that they will know how the parties' loyalties may be affected by it." *Vapor Corp.,* 173 W.Va. at 776 n. 10, 320 S.E.2d at 351 n. 10. However, in syllabus point 5 of *Reager v. Anderson,* 179 W.Va. 691, 371 S.E.2d 619 (1988), we held that it was in the trial court's discretion as to whether the "Mary Carter" settlement agreement should be disclosed to the jury:

Disclosure to the jury of the general nature of a 'Mary Carter' settlement agreement is not required in each case; such disclosure lies within the sound discretion of the trial court. Where the 'Mary Carter' agreement is not reached until after all or most of the evidence has been presented, and the settling defendant during closing argument and examination does not indicate to the jury a realignment of loyalties so as to prejudice the nonsettling defendant(s), it is within the sound discretion of the trial court to refuse to disclose the general nature of the 'Mary Carter' agreement to the jury.

None of the parties argue that the agreement contravenes some law or public policy.

---

**6.** We noted in syllabus point 2 of *Vapor Corp., supra,* that settlements must not contravene some public policy:

'The law favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy.' Syllabus Point 1, *Sanders v. Roselawn Memorial Garden, Inc.,* 152 W.Va. 91, 159 S.E.2d 784 (1968).

However, Dr. Ho argues that he was prejudiced by the nondisclosure of the "Mary Carter" settlement agreement, because Dr. Irisari could safely encourage a high verdict which would harm Dr. Ho.

We disagree. In the case before us, we find that the basic alignment of the parties was not significantly altered by the "Mary Carter" settlement agreement. Dr. Ho was brought into the action by a third-party contribution claim filed by Dr. Irisari. The plaintiff never sued Dr. Ho. Therefore, Dr. Ho's and Dr. Irisari's relationship was adversarial from the very beginning of the lawsuit, and the jury should have been aware of the adversarial nature between Dr. Ho and Dr. Irisari. Dr. Ho has failed to show how the "Mary Carter" settlement agreement realigned loyalties so as to prejudice him.[7] Accordingly, we find that the trial court did not abuse its discretion when it chose to not disclose the "Mary Carter" settlement agreement to the jury.

### IV.

The third issue is whether the jury's award of $785,550.00 for the decedent's reasonably expected loss of future earnings should be set aside. Dr. Ho has broken this issue into two parts.

### A.

■ The first part is whether the wrongful death statute only permits the beneficiaries of the award to recover income reasonably expected to be received from the deceased had he or she lived. For reasons explained below, we do not find that the statute only permits the beneficiaries of the award to recover income reasonably expected to be received from the deceased had he or she lived.

Dr. Ho and Dr. Irisari point to *W.Va.Code*, 55–7–6(c)(1)(B) [1985] which states that the jury verdict may include "compensation for reasonably expected loss of (i) income of the decedent, and (ii) services, protection, care and assistance provided by the decedent[.]"[8] The defendants point out that this Court has never construed the "reasonably expected" language found in the above code section of the Wrongful Death Act. They argue that the language should be interpreted so as to entitle the beneficiaries to be compensated only for that portion of the decedent's lost income that the beneficiaries could have reasonably expected to receive. *See Dover Corp. v. Perez*, 587 S.W.2d 761, 770 (Tex.Civ. App.1979), *supplemented by*, 591 S.W.2d 547 ("In a wrongful death action the pecuniary loss calculated upon a projection into the future ... and the awards should bear some ascertainable relation to the pecuniary benefits which the decedent's spouse or child might reasonably have expected to receive had the wrongful death not occurred." (citations omitted)) and *Wilson v. U.S.*, 637 F.Supp. 669, 673 (E.D.Va.1986) ("The issue turns on what amount, if any, the two beneficiaries could have 'reasonably expected,' regarding any loss of income from the mother's earnings.").

■ However, we find that syllabus points 2 and 3 of *Rice v. Ryder*, 184 W.Va. 255, 400 S.E.2d 263 (1990) answer this question:

2. West Virginia Code § 55–7–6 (1985) did not require that parents, brothers, or sisters be financially dependent upon the decedent in order to receive 'compensation for reasonably expected loss of income of the decedent, and services, protection, care

---

7. We recognize that it is much easier to examine a "Mary Carter" settlement agreement in hindsight. However, we caution trial courts to carefully scrutinize the situation created by a "Mary Carter" settlement agreement when determining whether to disclose the agreement to the jury. Simply put, as the risk of prejudice to the nonsettling defendant becomes greater, the need to disclose the "Mary Carter" settlement agreement to the jury becomes greater.

8. *W.Va.Code*, 55–7–6 was amended in 1989 and in 1992. However, the amendments do not affect the outcome of this case. We note that the 1985 version of the statute applies in the case before us since Ms. Mackey died on October 19, 1988: "Statutory changes in the manner and method of distributing the proceeds of a judgment or settlement for wrongful death will not be given retroactive effect, and the statute in effect on the date of the decedent's death will control." Syl. pt. 5, *Arnold v. Turek*, 185 W.Va. 400, 407 S.E.2d 706 (1991).

and assistance provided by the decedent. . . .'

3. In a wrongful death action, a showing of financial dependency upon the decedent is not a prerequisite to recovery of the damages specified in W.Va.Code § 55–7–6(c)(1) (1989).

If a showing of dependency is not required to collect damages, then it follows that there is no need to show that the beneficiaries reasonably expected to receive a portion of the income.

### B.

■ The second part to this issue is whether the trial court erred by failing to permit cross-examination of the plaintiff's economist as to personal consumption by the decedent. This issue was fully addressed in *Wehner v. Weinstein,* 191 W.Va. 149, 444 S.E.2d 27 (1994). This Court stated the following in syllabus point 12 of *Wehner:* "The language of W.Va.Code, 55–7–6(c)(1)(B)(i), that allows as part of the elements of damages in a wrongful death action compensation for reasonably expected loss of income of the decedent, does not require a deduction for estimated personal living expenses." Accordingly, we hold that it was not error for the trial court to decline to permit evidence relating to the personal consumption by the decedent.

### V.

■ The fourth issue is whether the trial court erred by failing to award a new trial due to the improper closing argument of the plaintiff's counsel. For reasons explained below we find that the trial court did not err.

The plaintiff's counsel made the following statement regarding *W.Va.Code,* 55–7B–8 [1986] during closing arguments:

[T]he Legislature did say that for that portion [the non-economic loss], it cannot exceed one million dollars. And that's a shame that happened recently, because if ever there was a case that called out for a verdict of several million dollars, this is it. And it makes me sad that that happened right before this case.

The plaintiff's counsel was referring to *W.Va. Code,* 55–7B–8 [1986] which states: "In any medical professional liability action brought against a health care provider, the maximum amount recoverable as damages for noneconomic loss shall not exceed one million dollars and the jury may be so instructed."

Dr. Ho points out that the West Virginia *Trial Court Rules for Trial Courts of Record,* Rule VI(a) states, in part: "Counsel may refer to the instructions to juries in their argument, but may not argue against the correctness of any instruction nor read the instructions to the jury." Dr. Ho contends that the statement made by the plaintiff's counsel was an argument over whether the legislature was correct in having a jury instructed as to the maximum anyone can be liable for in a medical professional liability action.

■ However, the trial court did advise the jury to disregard the remark. Furthermore, we stated in syllabus point 2 of *State v. Kennedy,* 162 W.Va. 244, 249 S.E.2d 188 (1978) that "[g]reat latitude is allowed counsel in argument of cases, but counsel must keep within the evidence, not make statements calculated to inflame, prejudice or mislead the jury, nor permit or encourage witnesses to make remarks which would have a tendency to inflame, prejudice or mislead the jury."

The jury had been instructed that they could not award more than $1,000,000.00 for noneconomic loss. Although the remarks made by the plaintiff's counsel regarding the wisdom of a $1,000,000.00 limitation may not have been appropriate, we do not find that the remark inflamed or prejudiced the jury to the extent which would mandate reversal. Accordingly, we affirm the trial court's decision to not award a new trial.

### VI.

■ The last issue is whether the trial court erred by permitting the decedent's "memory book" to be read into evidence during direct examination of the decedent's father.

After the decedent's father identified the "memory book" by identifying the decedent's

handwriting, the plaintiff's attorney read the following excerpt from the "memory book":

I plan to go to the Belmont Technical College in the fall to take up computer programming. This summer I have a job with Rose's sister three days a week baby-sitting. That way I won't have to give up my weekends. I don't plan on getting married for many, many years to come, because my main goal is to make something of myself. I plan to get very rich and travel a lot, meet a lot of handsome guys and to do fantastic things, not with the guys—well, maybe someday. I don't want to get an apartment where my friends are when we go to the beach.

Dr. Ho argues that a proper foundation was not laid for the admission of the "memory book" and that the statements contained in the "memory book" constitute inadmissible hearsay.

However, the plaintiff correctly points out that the statements contained in the "memory book" were not inadmissible hearsay under *W.Va.R.Evid.* 801 since the statements show an existing state of mind which is allowed under *W.Va.R.Evid.* 803(3):

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

. . . .

(3) *Then Existing Mental, Emotional, or Physical Condition.*—A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Additionally, the plaintiff correctly points out that under *W.Va.R.Evid.* 901(b)(2) that a nonexpert can give an "opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of litigation." Therefore, the decedent's father could authenticate or identify the "memory

book" by telling the jury that the handwriting in the "memory book" was his daughter's.

Dr. Irisari states that a correlation can be made between the case before us and *Gault v. Monongahela Power Co.*, 159 W.Va. 318, 223 S.E.2d 421 (1976). In *Gault* the plaintiffs sought to recover damages for injuries sustained by Donald Gault which they alleged were caused by the negligence of Monongahela Power Company. Donald Gault testified that although he retired and was receiving social security payments, he planned on returning to work as a pipefitter. We held in syllabus point 3 of *Gault* that such evidence was admissible: "A declaration of an intention to return to work is admissible in evidence to prove that the declarant actually had such intention." Therefore, we hold that the trial court did not err when it allowed the decedent's "memory book" to be read into evidence.

## VII.

Upon all of the above, we find no error in this case. Accordingly, we affirm the trial court's December 28, 1992, order.

Affirmed.